**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | NO. 3:10-cr-00260 |
| | ) | JUDGE HAYNES |
| v. | ) | |
| | ) | |
| ABDIFATAH JAMA ADAN et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## M E M O R A N D U M

This Memorandum addresses oral motions for acquittal that the Court reserved under

Fed. R. Crim. P. 29(b) and post trial motions filed by Defendants Idris Ibrahim Fahra, Andrew

Kayachith and Yassin Abdirahman Yusuf. After trial, the parties requested extensions of time to

file responses, supplemental responses, replies and surreplies. Given the factual complexity of

this action, the Court granted these requests. The last reply was filed by the Defendant Yusuf on

October 5, 2012. (Docket Entry No. 2875). Because these defense motions raise overlapping and

interrelated factual contentions as well as common legal issues, this Memorandum addresses all

of these Defendants' motions, except Defendant Fahra's renewed and supplemented motion for

judgment of acquittal (Docket Entry No. 2890) on venue.[1]

The United States filed this action against thirty Defendants and in the Second

Superseding Indictment, the Grand Jury charged the following offenses for which these

---

[1] On October 16, 2012, Defendant Fahra filed renewed and supplemental motion for
acquittal (Docket Entry No. 2890), and the Government filed its response. (Docket Entry No.
2919). That motion raises a venue issue particular to Fahra and will be addressed separately.

defendants were tried and that are pertinent for the motions addressed in this Memorandum:

Count One - conspiracy to violate 18 U.S.C. § 1591(a)(1) in violation of 18 U.S.C. § 1594(c); for conspiracy to recruits, entices, harbors, transports, provided, obtains or maintains anyone under the age of 14 and under the age of 18 for commerical sex acts in violation of 18/1951(a)(1);

Count Two - conspiracy to violate 18 U.S.C. § 1591(a)(2) in violation of 18 U.S.C. § 1594(c) for conspiracy to benefit financially or by receiving anything of value, from participating in a venture which recruits, entices, harbors, transports, provides, obtains or maintains anyone under the age of 14 and under the age of 18 in violation of 18/1951(a)(2);

Count Twelve - knowingly recruiting, enticing, harboring, transported provided and obtaining by any means a minor under the age of 14, Jane Doe Two, for commercial sex 18 U.S.C. § 2 and 1591(a).

Count Thirteen - knowingly recruiting, enticing, harboring, transported provided and obtaining by any means a minor under the age of fourteen, Jane Doe Two, by means of force, threats of force, fraud and coercion enticement and transport of a minor female Jane Doe Two who had not attained the age of 18 to engage in commercial sex in violation of 18 U.S.C. § 2 and 1591(a).

(Docket Entry No. 591, Second Superseding Indictment at 3-25 and 36-38).

To provide context for the trial and issues in these motions, in earlier proceedings, the Court denied the Defendant Bashir Yasin Mohamud's motions for severance (Docket Entry Nos. 521 and 961), but Defendants Bashir Yasin Mohamud filed a second motion for a severance and other Defendants filed motions for a severance on various grounds. (Docket Entry Nos. 933, 1051, 1060, 1065, 1071, 1079, 1086, 1116 117 and 1307). The Court granted those motions in part and denied in part. (Docket Entry Nos.1394 and 1395). Pursuant to Fed. Crim. P 8(a), the Court severed Counts 15, 16, 17, 18, 19, 20, 22 through 24 from the March 20, 2012 trial of this action. (Docket Entry No.1395). Pursuant to Fed. R. Crim. P. 14, the Court also severed charges

against Defendants Bashir Yasin Mohamud and Mustafa Ahmed Mohamed for a separate trial for those Defendants on Counts 15, 16, 17, 18, 19, 20, 22 through 24 that involved or were related to sex trafficking of adult females. Id.

In subsequent proceedings, based upon the legitimate request of Defendant Hamdi Ali Osman for new counsel, the Court severed all charges against Defendant Hamdi Ali Osman from the March 20, 2012 trial. The Court did so in the interests of justice to allow her new counsel to be appointed and to be prepared for trial. Based upon the similarity of the counts and to avoid repetition of witnesses, the Court also provided Defendants: Abdullahi Sade Afyare, Yasin Ahmed Farah, Muhiyadin Hussein Hassan, Abdifatah Sharif Omar, Liban Sharif Omar, Mohamed Sharif Omar, Haji Osman Salad and Bibi Ahmed Said, the option to be severed and tried with Defendant Hamdi Ali Osman in a joint trial. All of these latter Defendants filed notices of their elections to be severed from the March 20, 2012 trial. (Docket Entry Nos. 1632, 1633, 1636, 1647, 1648, 1656 and 1670).

Jury selection commenced on Tuesday, March 20, 2012 and a jury was empaneled on March 22, 2012, but the Court granted several defense counsel's motions for a stay or continuance of the trial. (Docket Entry No. 2133). These defense counsel cited the Government's recent disclosures of more than 6000 pages of documents, including the lead agent's rough notes, other police officers' emails and recorded 2009 interview of Defendant Hersi. These disclosures were made during jury selection on March 23, 2012. The Court continued the trial for one (1) week to April 2, 2012 to enable defense counsel to review those voluminous discovery materials. At a March 29, 2012 status conference, Defendant Abdullah Hashi requested a second continuance because some of the rough notes in these belated discovery materials were in redacted format and unreadable. (Docket Entry No. 2177). The Court granted

that motion and set a hearing on whether the Government's proof could establish that the Defendants Abdullah Hashi, Abdirahman Hersi and Hassan Ahmed Dahir were 18 years of age at the time of their alleged offenses. After the latter hearings, the Court concluded that the Government's proof of these Defendants' ages at the time of their offenses was insufficient to establish the Court's jurisdiction and that under United States v. Chambers, 944 F.2d 949, 957 (6th Cir. 1991) these Defendants were governed by the Juvenile Delinquency Act. (Docket Entry No. 2554). The Court granted the Government's motion for a mistrial without prejudice. Id. Trial for the remaining Defendants resumed on April 4, 2012. (Docket Entry Nos. 2210 and 2258).

After proof and argument concluded on April 30, 2012, the jury deliberated five days before returning a verdict of acquittals of Defendants: Ahmad Abnulnasir Ahmed, Musse Ahmed Ali, Fadumo Mohamed Farah, Dahir Nor Ibrahim, and Mohamed Ahmed Amalle on Counts One and Two; and Defendants Fatah Haji Hashi and Mohamed Ahmed Amalle on Counts One, Two, Twelve and Thirteen. The jury found Defendant Idris Ibrahim Fahra guilty on Counts One and Twelve, but not guilty on Counts Two and Thirteen. The jury found Defendants Andrew Kayachith and Yassin Abdirahman Yusuf guilty on Count One, but not guilty on Counts Two, Twelve and Thirteen. In sum, only three defendants Idris Ibrahim Farah, Andrew Kayachith and Yassin Abdirahman Yusuf were found guilty on Count One and only defendant Idris Ibrahim Fahra was found guilty on Count Twelve.

Before the Court are the following oral and written motions that were made during trial, orally at the close of the Government's and defense's proof and after the jury's verdict:

> (1) Idris Fahra's, Andrew Kayachith's and Yassin Yusuf's oral motions for acquittal at the close of the Government's proof and renewed at the conclusion of

4

all proof that the Court reserved under Fed. R. Crim. P. 29 (b);

(2) Yassin Yusuf's motion to dismiss (Docket Entry No. 2280);

(3) Yassin Yusuf's motion to dismiss (Docket Entry No. 2296);

(4) Andrew Kayachith's motion to dismiss (Docket Entry No. 2392) that Defendant Yusuf joined;

(5) Yassin Yusuf's motion for a new trial (Docket Entry No. 2502);

(6) Yassin Yusuf's motion for judgment notwithstanding the verdict /renewed motion for acquittal (Docket Entry No. 2507); and

(7) Defendant Kayachith's motion for a new trial (Docket Entry No. 2617) that Defendant Yusuf joined. (Docket Entry No. 2618).

The Government has filed its responses, supplemental responses and a surreply. (Docket Entry Nos. 2396, 2552, 2577, 2694 and 2709). The Court will group these motions based upon the common claims and issues presented.

### A. Defendants' Oral Motions for Acquittal, Defendant Kayachith's and Yusuf's Motions to Dismiss and Yusuf's Motions for Acquittal and for a New Trial[2]

The common claims in these defense motions are: (1) the insufficiency of the Government's proof on Jane Doe Two's actual age and on these Defendants' agreement to join any conspiracy to sex traffic minors; (2) the Government's presentation of the false testimony of Jane Doe Two; and (3) the Government's proof establishing multiple conspiracies, not a single

---

[2] Yusuf's motion for acquittal presents a claim based upon the Government's violations of discovery Orders that is related to a claim in his motion for a new trial based upon newly discovered evidence claim. These interrelated issues are addressed separately in a subsequent section of this Memorandum. In addition, Defendant Kaychith raises other claims in his motion for a new trial that are not common to other Defendants and that will be addressed separately.

conspiracy. To assure consideration of each Defendant's specific contention, the rationale for each Defendant's motion is set forth below.

At the close of the Government's proof and the conclusion of all proof, Defendant Fahra moved for acquittal, arguing in sum: (1) that the Government's proof contains a fatal variance by showing multiple conspiracies; (2) that Jane Doe Two's testimony about prostitution is not in any of her prior grand jury testimony nor in police reports nor the Government's bill of particulars; (3) the lack of proof that the Defendant Fahra went with Jane Doe Two to any of the apartments where Jane Doe Two described acts of prostitution; and (4) that Jane Doe Two's testimony on the dates that she was at Defendant Fahra's apartment are significantly inconsistent. In response, the Government cited Jane Doe Two's testimony that acts of prostitution occurred at Defendant Fahra's apartment, that Defendant Fahra permitted and benefitted from prostitution at his apartment, and that under the applicable law, these claims are jury issues and proof of the exact dates of these acts is not required.

Similarly, at the close of the Government's proof and at the conclusion of all proof, Defendant Kayachith moved for acquittal, contending, in sum: that was the Government's proof of multiple conspiracies constitutes a material variance from the Second Superseding Indictment's theory of a single conspiracy and that Government failed to present any proof that Kayachith entered into an agreement with any other person to commit the crime of sex trafficking of a minor. In his motion to dismiss, Defendant Kayachith contends, as did Fahra, that Jane Doe Two gave false testimony about having sex with ten men for money on the weekend of April 25, 2009 and any verdict based upon that false testimony cannot stand.

At the close of the Government's proof and at the conclusion of all proof , Defendant

Yusuf moved for acquittal, arguing in essence:(1) that the Government did not prove Jane Doe Two's age beyond a reasonable doubt; (2) that Jane Doe Two's earlier statement to Yusuf in 2007 that she was 16, precludes his guilt based upon any conduct in 2009; (3) that a fatal variance exists between the Government's evidence at trial of multiple conspiracies and the Government's theory of an overarching single conspiracy in the Second Superseding Indictment; and (4) that the Government's proof did not establish Defendant Yusuf's agreement to join any conspiracy, as alleged by the Government.

In response, the Government argues, in essence, that its proof was sufficient to support the Defendants' convictions; that any variance between Jane Doe Two's pretrial statements, her grand jury testimony and her trial testimony are credibility issues for the jury; that Jane Doe Two's testimony alone is sufficient to prove her age; that proof of Jane Doe's age is corroborated by other proof; that proof a defendant knew the victim's age is not required under 18 U.S.C. § 1591(c); that the existence of a single or multiple conspiracy is a factual issue for the jury; and that the Defendants Mohamed Sharif Omar and Liban Sharif Omar provide the common factual basis for the Government's single conspiracy theory.

### 1. Sufficiency of the Evidence Claims–Age

These Defendants contend that the Government did not prove Jane Doe Two's age beyond a reasonable doubt. The Second Superceding Indictment's allegations concerning Jane Doe Two's age are that "On or about November 26, 2006, Jane Doe Two, a Somalia female and person who had not obtained the age of 13 years, was enticed to engage in sex acts for the ultimate purpose of obtaining her for use in commercial sex acts." (Docket Entry No. 591 at 10). Here, given the provisions of 18 U.S.C. § 1591 that applies to a "person who has not attained the

age of 18 years", Jane Doe Two's date of birth is a critical element of the Government's proof[3].

On direct examination at trial about her age, Jane Doe Two first testified that she was 17 years of age and was born on September 10, 1996. Jane Doe Two received this information from her mother. Jane Doe Two stated that she learned shortly before her testimony that this birth date is false. Jane Doe Two admitted that in 2007, she represented to Defendant Yusuf that she was 16 years of age. The Government's other proof of Jane Doe Two's age included school records, testimony from classmates and photographs. In addition, Darnell Hughes, a government witness, testified that before the April 2009 trip to Nashville, Jane Doe Two was offered to him for sex, but Hughes declined because he thought Jane Doe Two was too young.

DNA tests and subsequent stipulations establish that the immigration records reflecting Jane Doe's September 10, 1999 birth date are false. The immigration records provide the bases for other public records of Jane Doe Two's birth date. During trial on April 12, 2012, Jane Doe Two who testified that she is a high school senior, listed herself on her Facebook page as working in the "NBA" National Basketball Association and having "studied at Ridgewater College Willmar, MN". (Docket Entry No. 2629, at pp. 1365-66; Docket Entry No. 2465, Witness/Exhibit List, Defendant 29 Exhibit 7, at 4). Darnell Hughes, a government witness admitted that when Jane Doe Two was offered to him for sex, Jane Doe Two showed him a driver identification with an older age. Yusuf's proof included documentary evidence that on her

---

[3] Since the filing of the original indictment, the issue of age of several Defendants who are identified in the Second Superceding Indictment as minors at the time of these offenses, are important for jurisdictional and proof purposes. 18 U.S.C. § 5031 et seq. (The Juvenile Delinquency Act") and United States v. Odom, 13 F.3d 949, 957(6th Cir. 1991)(defendants cannot be held responsible for criminal acts as juveniles, but criminal acts of juveniles may be probative of the issue of whether a defendant, once an adult, intended to join a conspiracy).

website application, Jane Doe Two listed her birthday as July 26, 1990[4]. (Docket Entry No. 2465, Witness/Exhibit List, Defendant 29 Exhibit 8, at 4). Defendant Yusuf also cites Jane Doe Two's sworn statement filed with Tennessee authorities that she was "abducted" to Tennessee (Docket Entry No. 2465, Witness/Exhibit List, Defendant 29 Exhibit 1, at 4) that is at complete variance to Jane Doe Two's written and oral statements to Nashville police officers and a St. Paul Police officer, shortly after she was taken into custody in Nashville.

A motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure is "a challenge to the sufficiency of the evidence." United States v. Jones, 102 F.3d 804, 807 (6th Cir.1996). If the Court reserves a motion for acquittal at the end of the Government's proof, then the Court can consider only the proof presented at the time of the motion. Fed. R. Crim. P. 29(b). The standard for deciding a motion for acquittal[5] "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Alvarez, 266 F.3d 587, 596 (6th Cir.2001). In reviewing a motion for acquittal, the Court draws "'all available inferences and resolve[s] all issues of credibility in favor of the jury's verdict.'" Id. (quoting United States v. Salgado, 250 F.3d 438, 446 (6th Cir. 2001)); United States

---

[4]As discussed infra, Defendant Yusuf has since acquired an affidavit that Jane Doe Two was born in 1990 or early 1991 (Docket Entry No. 2875-2, Caabi Affidavit) that the Government disputes.

[5] Yet, in ruling on a motion for a new trial "[a] district judge, in considering the weight of the evidence for purposes of adjudicating a motion for new trial, may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence". United States v. Hughes, 505 F.3d 578, 592-93 (6th Cir. 2007) (citing United States v. Lutz, 154 F.3d 581, 589 (6th Cir.1998).

v. Maliszewski, 161 F.3d 992, 1006 (6th Cir.1998). Review of the sufficiency of the evidence is "quite limited." United States v. Crossley, 224 F.3d 847, 855 (6th Cir.2000).

Where the age of a witness is a critical issue in a criminal case, expert testimony may be necessary[6], United States v. Katz, 178 F.3d 368, 373 (5th Cir. 1999), but is not always required. United States v. O'Malley, 854 F.2d 1085, 1086-88, n.3 (8th Cir. 1988); United States v. Riccardi, 298 F.Supp.2d 1212, 1219 (D. Kan. 2003). Here, the Government's proof of Jane Doe Two's age at trial does not contain any documentary evidence or family proof of Jane Doe Two's birth date. The principal source of Jane Doe Two's age is the testimony of Jane Doe Two that is admissible. Fed. R. Evid. 804(b)(4)(A). Yet, Jane Doe Two's testimony about her age is based upon false information from Jane Doe Two's mother. As discussed infra, these Defendants raise serious issues about the credibility of Jane Doe Two's testimony, but the Government's other proof on Jane Doe Two's age was from lay witnesses, schoolmates and school photographs. Lay testimony is admissible and could provide the jury a basis to find that at the times at issue, Jane Doe Two was under the age of 18. Based upon the principles applicable to the consideration of

---

[6] During trial, late on or about April 8, 2012, the Government served defense counsel with statements of a radiologists and dentist who opined about Jane Doe's age. These reports cited Jane Doe's birth date as September 10, 1994 that based upon immigration records and DNA tests is false. Defendants cited the lack of the bases for these experts' opinions and their qualifications. The Defendants earlier moved for disclosures of experts' reports, but the Government represented that no such reports were to be used and the Court denied the defense motion. (Docket Entry Nos. 1088, 1213 and 1613). The Court granted the requests to exclude these expert statements based upon the precedents in this district and the fundamental unfairness to the defense to secure experts during the trial. See United States v. Davis, 514 F.3d 596, 604 (6th Cir. 2008) (upholding district court's denial of exclusion of expert report based upon the Government's substantial compliance with Rule 16(a)(1)(G)). No such substantial compliance is present here. Moreover, given the false immigration documents and Jane Doe Two's false birth certificate that was known to the Government a year prior to trial and the disputed circumstances of Jane Doe Two's life prior to arrival in this country, the Court concludes that expert testimony would be necessary for the age issue in a retrial.

motions for acquittal, the Court concludes that Defendants' motions for acquittal on the age element should be denied.

## 2. Proof of Defendants Joining a Conspiracy

These Defendants' next challenge is, in essence, whether the Government proved beyond a reasonable doubt that each of these Defendants joined the overarching single conspiracy with other Defendants to engage in the sexual trafficking of minor females. In sum, Kayachith contends that the Government lacks any proof that Kayachith knew about this conspiracy and voluntarily joined any such conspiracy. Defendant Fahra argues that the Government witnesses, Jane Doe Two and Muna Abdulkidar, identified him as involved only with Jane Doe Two who disputed the dates in the Government's bill of particulars as to when she was at Fahra's apartment before the May 6th trip to Rochester. Fahra also cites the lack of any proof that he went on any travel to offer Jane Doe Two for sex trafficking.

Here, the jury found these Defendants guilty on Count One of the Second Superseding Indictment that charged a conspiracy from 2000 through July 2010 involving four minor Jane Does One through Four, but of those, only Jane Doe Two testified. There was proof that Defendants Adan and Ibrahim interacted with Jane Doe Five in 2000 to engage in prostitution as a minor. At trial, Jane Doe Five testified that in 2000 Defendant Adan induced her into sex trafficking as minor at the age of 17. As to that inducement, the Government's theory was that Defendant Fadumo Farah, Adan's wife, was a part of this conspiracy that continued to Nashville in 2010, but the jury acquitted Fadumo Farah of such activity. Adan pled guilty to a non-sex trafficking charge. (Docket Entry No. 2115).

According to the Government's proof, Defendants Fahra and Yusuf interacted with Jane Doe Two from November 2006 to May 2007. The Government's proof was that at Defendant

Fahra's apartment Jane Doe Two was told by Fahra and others to engage in sex for money and money was collected at Fahra's apartment for non gang members' sex with Jane Doe Two. According to Jane Doe Two, she went to Fahra's apartment as a runaway in November 23, 2006 when Jane Doe Two admitted there was not any prostitution activity. Both Jane Doe Two and Saida Haji testified that at this residence, Jane Doe Two performed sex acts with several individuals before she performed oral sex on Kayachith. Jane Doe Two testified that nothing of value was exchanged for any of these sex acts.

The Government's proof was that in 2007, Defendant Yusuf drove Jane Doe Two to Rochester Minnesota and Jane Doe Two testified that she was to be sold for sex in Rochester, but Jane Doe Two earlier stated that the Rochester trip was to conduct a robbery. There was a weapon found in the vehicle when the vehicle was stopped and Jane Doe Two was playing with the weapon.

In April 2009, Defendants Kayachith, Fahra and Yusuf interacted with Jane Doe Two. The Government's proof at trial about Kayachith's involvement with Jane Doe Two was in the April 24 – 28, 2009 conduct. According to Jane Doe Two, on April 25, 2009 she overheard Defendants Haji Salad, Abdullahi Afyare, and Liban Sharif Omar, aka Sunderra, planning a trip to Nashville. Andrew Kayachith was present during that conversation, but there was not any proof that Kayachith participated in this conversation. Jane Doe 2 then testified that throughout that day, Kayachith, "AK", drove her and others to alleys in Minneapolis looking and calling people about sex with Jane Doe Two for money. During this time, Jane Doe Two testified that she engaged in sex with ten people in which cash money was collected by Haji Salad. Jane Doe Two's book bag was found in the trunk of Kayachith's automobile. On the morning of April 26, 2009, Jane Doe Two had sex with Biggie without anything of value exchanged, but Kayachith

12

was present at the garage where the sex act occurred. On the morning of April 26, 2009, Jane Doe 2 testified that Abdullahi Afyare contacted a person named "AZ" as a potential purchaser of sex acts. Kayachith was present. On April 27 through April 28, 2009, Kayachith is one of five persons who travel in an automobile from Minnesota to Nashville, Tennessee with Jane Doe Two who testified that this travel was to sexually exploit her.

Defendant Kayachith cites testimony that at approximately 4 p.m. on April 24, 2009, Defendant Kayachith was at the residence of Abdikarim Ali when Haji Salad and Abdullahi Afyare brought Jane Doe Two to that residence. Both Jane Doe Two and Saida Haji testified that at this residence, Jane Doe Two performed sex acts with several individuals before she performed oral sex on Kayachith. Jane Doe Two testified that reason she engaged in sex the weekend of April 24, 2009 was because Hollywood told her to have sex with them and he was already mad at her so she was trying to please him. For the remaining part of April 24, 2009, Jane Doe Two testified that she remained with this group of guys and later attended an Africa Night Party. She finished the night at the Americ Inn Hotel where she had sexual intercourse with Defendant Haji Salad and others without any exchange of money.

Defendants cite the testimony of Jane Doe Two on cross-examination admitting that she never stated in her prior statements and/or testimony that any sex acts performed by her on April 25th were in exchange for money. On cross-examination, Jane Doe Two did not testify that Kayachith agreed to prostitute her. Darnell Hughes, a government witness, overheard a conversation between Defendant Haji Salad and Mohamed Ahmed Amalle about Jane Doe Two's sex acts. The jury, however, acquitted Amalle. A person identified as DK was present during this discussion of the sexual acts that Jane Doe Two would perform. Hughes, however, did not relate this conversation about these sex acts to sex trafficking nor state that Kayachith

participated in this conversation. Hughes testified that the Defendants were not engaged in any prostitution because if they had, he would have heard about that. Hughes also explained that the Nashville trip had been planned prior to that April 27-29 weekend and, because he was ill, Jane Doe Two wanted to take his place in the vehicle.

On the conspiracy charge "[w]hat is controlling is whether the government has proved that there was an overall agreement on a common goal". United States v. Robertson, 67 Fed. Appx. 257, 261 (6th Cir. 2003). "While a single conspiracy does not become multiple conspiracies simply because each member of the conspiracy does not know every other member,"it is necessary to show that each alleged member "agreed to participate in what he knew to be a collective venture directed toward a common goal." United States v. Warner, 690 F.2d 545, 549 (6th Cir.1982).

The jury credited Jane Doe Two's testimony that she was sold for sex at Fahra's apartment with others in 2006 and traveled to Rochester with Yusuf for sex trafficking. Jane Doe Two testified that Kayachith drove Jane Doe Two and other Defendants to various sites in Minneapolis to sell her for sex. The jury credited her testimony about the commercial nature of the sex at Fahra's apartment, in the alleys in Minneapolis and the nature and purpose of the Rochester, Minnesota and Nashville trips. Based upon this proof, the jury found these Defendants guilty on Count One. Given the principles applicable to motions for acquittal, Court concludes that the jury found that the Government proved that Defendants Yusuf and Kayachith knew of and agreed to join a conspiracy to traffick Jane Doe Two who was under the age of 18, for commercial sex. The issue of the existence of a single conspiracy or multiple conspiracies is a distinct issue and is addressed separately infra.

### B. False Testimony Claims

These Defendants next challenge as false Jane Doe Two's testimony as to her age and other matters about her involvement with these Defendants. Defendant Fahra cites Jane Doe Two's inconsistencies about the dates of the purported acts with him. These Defendants cite Jane Doe Two's material omissions about being sold for sex because such statements are not in her numerous prior interviews with police officers and agents nor in her grand jury testimony about the events of April 25, 2009. The Government contends that any differences and inconsistencies are matters for the jury and as a matter of law, do not constitute the use of false testimony.

### 1. Age

The earlier analysis of the Defendants' contentions about the sufficiency of the Government's evidence of Jane Doe Two's age is incorporated herein by reference. Defendants cite additional instances of testimony about Jane Doe Two's age that the Defendants contend are, in fact, false testimony.

On direct examination, Jane Doe testified that her father died before she left Africa for the United States in 1996[7]. For context, the immigration records reflect that Ibrahim Mohamed Hassan, Jane Doe Two's biological father, arrived in the United States in August 1993 that renders Jane Doe Two's September 10, 1996 birth date false. As discussed below, in 2009 Jane Doe Two also knew who her real father was and knew that the deceased person whom she testified about at trial was her father, in fact, was not her father. Jane Doe Two's mother provided

---

[7] In addition, Jane Doe Two's mother and biological father submitted false affidavits in this action, signed by Jane Doe Two's counsel, that Ibrahim Mohamed Hassan was not the biological father of Jane Doe Two. Upon Yusuf's motion and proof, the Court ordered DNA testing that established to more than 99% certainty that Ibrahim Mohamed Hassan is Jane Doe Two's biological father and that Jane Doe Two's mother and biological father submitted false affidavits to the Court. (Docket Entry Nos. 2162 and 2164).

a false birth certificate to the Tennessee authorities for Jane Doe Two's application for monetary benefit arising out of her travel to Nashville (Docket Entry No. 2465, Witness/Exhibit List, Defendant 29 Exhibit 15, at 11). Almost a year prior to trial, lead Government counsel knew that Jane Doe's birth certificate was false.

## 2. Jane Doe Two's "Abduction" Statement

Another false statement of Jane Doe Two cited by Defendant Yusuf is Jane Doe Two's sworn statement filed with Tennessee state authorities that she was "abducted" to Tennessee in April, 2009. (Docket Entry No. 2465, Witness/Exhibit List, Defendant 29 Exhibit 1, at 4). Shortly after Jane Doe Two was taken into police custody in Nashville for juvenile detention and was away from the Defendants, Metropolitan Nashville Davidson County police officers interviewed Jane Doe Two. In a recorded interview, the Metro police officers instructed Jane Doe Two to tell them the truth about her presence in Nashville. ((Docket Entry No. 2465, Witness/Exhibit List, Defendant 17, Exhibit 5, at 4). In this interview and in a contemporaneous handwritten statement for the officers, Jane Doe Two stated that she left her high school to be with her boyfriend; had sex with multiple persons because she became angry with her boy friend; and traveled to Nashville with the Defendants in the vehicle to steal automobile parts for the Lincoln vehicle in which she and several other Defendants were passengers. (Docket Entry No. 2465, Witness/Exhibit List, Defendant 17, Exhibit 2, at 4).

During or shortly after the Metro police interview, Heather Weyker, the government's lead agent in this action, also interviewed Jane Doe Two. In a taped telephone conversation of this interview, Weyker asks Jane Doe Two why she ran away again. Jane Doe Two has a history of repeatedly running away from home with several of the Defendants in this action. Moreover, the proof was that Jane Doe Two actively sought out several of the Defendants. Darrell Hughes,

a Government witness who testified under a grant of immunity, testified that Jane Doe Two wanted to take his place on the Nashville trip. Defendants contend that this evidence is wholly inconsistent with Jane Doe Two's sworn statements to Tennessee authorities that she was abducted for the Tennessee trip. As noted earlier, Hughes testified that the Defendants' travel to Nashville was not to engage in any prostitution because if so, he would have known about it.

Defendant Fahra cites Jane Doe's inconsistent statements about the dates that Jane Doe Two engaged in acts of prostitution at various apartments, as contradicting the Government's bill of particulars.[8]

### 3. Jane Doe Two's Material Omissions

Another part of the Defendants' false testimony contentions are the material omissions in Jane Doe Two's trial testimony. In sum, the Defendants cite Jane Doe Two's omissions of material facts in her numerous interviews with police officers, agents and her testimony before the grand jury about her observing money exchanged for sex with her. The core of this falsity claim is that despite the numerous interviews with law enforcement agents and government counsel, Jane Doe Two never mentioned that she had sex with at least ten people on Saturday, April 25, 2009, nor that she observed money exchanging hands for sex with her, until trial. The Government contends these defense assertions are jury issues and also cites the jury instructions that in assessing credibility of a witness, consideration is given to any material statements that a witness testifies to at trial, but omitted in prior statements about the events at issue.

---

[8]After review of the Second Superseding Indictment and given the 10 year span of the conspiracy in ten states and multiple cities, the Court granted the defense motions for bill of particulars that required a listing of the dates and locations of the Defendants' acts constituting the conspiracy. (Docket Entry No. 1750, Order).

At trial, Jane Doe Two, the Government's principal witness, testified during her direct examination that on Saturday, April 25, 2009, prior to the Nashville trip, she had sex with at least ten people in alleys in Minneapolis in exchange for money. On cross-examination, Jane Doe Two again testified that this sexual activity was in exchange for cash money that she observed exchange hands. Defendant Kayachith contends that Jane Doe Two's trial testimony directly contradicts her testimony before the Grand Jury on October 7, 2009 about sex in the alley that was as follows:

Q: Did anything happen to your phone on Saturday?

A: No. I found out that Hollywood and them had it later during the day. So we get up, went to go get some toothbrush and mouthwash and then we was driving around in alleys and smoking and meeting up with guys, having sex in cars.

**Q. Were any of these guys paying for the sex?**

**A: No.**

**Q: Why not?**

**A: Because they were their friends. They would not let their friends pay, they were homies.**

(Docket Entry No. 2392, Kayachith's motion to dismiss at 3, Grand Jury Transcript, pages 78 – 79; Docket Entry No. 2645, Trial Transcript at pp.2665-66) (emphasis added). In addition, Defendant Yusuf cites Jane Doe Two's failure to mention, prior to her trial testimony, that her trip to Rochester, Minnesota was to go to an apartment for sex.

Defendants argue that Jane Doe Two's testimony about money exchanges for sex are significant and material omissions of material facts given this extensive multi-state investigation of commercial sex trafficking. Defendant Kayachith cites Jane Doe Two's

approximately thirty interviews with investigators and prosecutors over the past three and half years. Kayachith argues that Jane Doe's Two's statements about sex for money is not in any of the 50,000 pages of these Jane Doe Two interviews and other documents produced by the Government in this action prior to trial. Kayachith's counsel also cites his pretrial request of Government's lead counsel to provide any report or document reflecting Jane Doe Two's trial testimony on observing the exchange of money for sex with her. The lead Assistant United States Attorney confirmed that there were not any documents or reports reflecting this testimony and explained that not all a witness's statements is recorded in reports and that Jane Doe Two's Grand Jury testimony only discussed her sex with gang members. Defendants also argue that Jane Doe Two's observation of the money exchange also is not listed in any overt acts in the Second Superseding Indictment nor in the Government's bill of particulars for the trial of this action that was required by Court Order.

The Government's response is that Jane Doe Two's trial testimony about money exchanging hands was an addition to her previous testimony. The Government argues that discrepancies between grand jury testimony and trial testimony are not material and were resolved by the jury. The Government notes that Jane Doe Two also testified that "there was a lot of people that day. It was a long Saturday," (Docket Entry No. 2628, Trial Transcript at p. 926), and cite testimony that Jane Doe Two had free sex with gang members that also was "something of value" for the sex trafficking charges.

As noted earlier, contrary to the Court's discovery orders, the Government produced more than 6,000 pages of agents' notes and emails after the trial started. Among those documents are four pages of undated rough notes, including notes of Heather Weyker, the

Government's lead agent.[9] Of these rough notes, only one page contains Weyker's quoted references about Jane Doe Two's statements: "find guys to have sex for money." (Docket Entry No. 2396-1). As to the Nashville trip, this page of the Weyker rough notes reflects: "Have sex w/guys in TN-she is going to 'be on a money mission'"; "Purpose of her going is to TN is too have sex"; "in car going to TN talked about [Jane Doe Two] mtg guys for sex & $. They ask her." Id. A second undated rough note reads, in pertinent part: "They leave and go different places and she has sex with a number of different guys. [scratched out ] Alleys had sex in alleys w/different guys." (Docket Entry No. 2396-2). In these statements attributed to Jane Doe Two, Jane Doe Two  never  actually states that she observed any actual exchange of money for sex with her.

For his motion to dismiss based upon Jane Doe Two's material omissions and false trial testimony, Kayachith cites Napue v. Illinois, 360 U.S. 264 (1959), Rosencrantz v. Lafler, 568 F.3d 577 (6th Cir. 1989), and United States v. LaPage, 231 F.3d 488, 490 (9th Cir. 2000).  The Government responds that in a criminal trial, the credibility of the witness is a jury determination, citing Hoffa v. United States, 383 U.S. 293, 311 (1966).

As to whether a prosecutor failed to correct false testimony, Defendants must prove that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. Coe v. Bell, 161 F.3d 320, 343 (6th Cir.1998). The Defendants' burden is to show that the testimony was actually perjured. United States v. Griley, 814 F.2d 967, 971 (4th

---

[9] Weyker did not testify at trial and after prior hearings in this action, the Court expressed serious concerns about the truthfulness of Weyker's testimony to the grand jury. See Docket Entry No. 1392, Court's Memorandum at 2-3; Docket Entry Nos. 2664 and 2673, July 31, 2012 detention hearing of Abdifitah Sharif Omar (Transcript not prepared).

Cir.1987). To set aside their convictions as based upon false testimony, the cited testimony must be "indisputably false testimony." <u>Rosencrantz</u>, 568 F.3d at 585. A conviction obtained by the knowing use of perjured testimony must be set aside if "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury". <u>Id.</u> at 583. If there is any reasonable likelihood that the government knowingly relied on perjury to obtain a guilty verdict, reversal is required. <u>Knighton v. Mullin</u>, 293 F.3d 1165, 1174 (10th Cir. 2002).

As examples of meeting this burden of demonstrating perjury, where a witness gives a "credible recantation", such a showing is insufficient, unless the witness "recants the testimony that names the defendant as the perpetrator of the crime". <u>See</u> <u>Smith v. Roberts</u>, 115 F.3d 818, 820 (10th Cir.1997) (footnote omitted). Where a government witness admits on cross examination that his testimony on direct examination about not discussing forfeiture of property "was [n]ot entirely true," was not false testimony because the witness's testimony on direct examination "was not material". <u>United States v. Langston</u>, 970 F.2d 692, 700-01 (10th Cir.1992). "[I]nconsistencies between [a witness's] grand jury and trial testimony does not warrant the inference that the government knowingly introduced false testimony". <u>United States v. Hemmer</u>, 729 F.2d 10, 17 (1st. Cir. 1984) (citing <u>United States v.Holladay</u>, 566 F.2d 1018, 1019 (5th Cir. 1978) ("Presentation of a witness who recants or contradicts his prior testimony is not to be confused with eliciting perjury. It was for the jury to decide whether or not to credit the witness"); <u>United States v. Crockett</u>, 435 F.3d 1305, 1316 (10th Cir. 2006)(rejecting claim of false statement where witness testified in grand jury that Defendant planned to bring back the $500,000 in offshore funds in increments smaller than $10,000 to avoid notifying the IRS, but later testified at trial that they recovered the offshore funds in seven transactions, all but one of

which were in amounts much larger than $10,000).

The Court shares the Defendants' concerns that Jane Doe Two's trial testimony is not simply a contradiction with prior statements, but are material omissions about critical facts that if true, one would expect to have been presented to the grand jury. Yet, these facts about Jane Doe Two seeing money exchanged for sex with her were not presented to the grand jury and the lead agent's notes were not produced until after trial started. Yet, these omissions were presented to the jury and notwithstanding these materials omissions, by its verdicts, the jury still found that these Defendants sexually trafficked Jane Doe Two, as a minor. The above-cited case law recognizes that a finding of perjury does not arise because a witness provides material testimony for the first time at trial and testifies differently from the witness's grand jury testimony. The agent's abbreviated quotes of Jane Doe Two about sex for money lend some credence to Jane Doe Two's trial testimony. On the material omissions claims, the Court concludes that under Rosencrantz, the Defendants have raised serious issues of credibility, but have not shown Jane Doe's testimony to be "indisputably false" that is necessary to grant the Defendants' motions for acquittal on these claims.

### C. Multiple Conspiracies Claims

The Defendants' next common challenge is that the Government charged a single conspiracy, but actually proved multiple conspiracies at trial that constitutes a material variance requiring the setting aside of their convictions. Defendants argue that the Government's proof established five distinct conspiracies: (1) the Jane Doe Five conspiracy from 2000 to 2006 involving Defendants Adan and Ibrahim; (2) the 2006-2009 conspiracy involving Jane Doe Five and Defendant Adan, Ibrahim and Fadumo Farah; (3) the 2006 to 2007 Jane Doe Two conspiracy

involving Defendants Abdullah Hashi, Mohamed Ahmed Amalle, Fuad Nur and Idris Ibrahim Fahra; (3) the May 2007 Rochester trip involving Defendants Fatah Hashi, Hassan Ahmed Dahir and Yassin Abdirahman Yusuf; and (5) the April 2009 Jane Doe Two conspiracy involving Defendants Abdullahi Sade Afyare, Abdikarim Osman Ali, Haji Salad, Yassin Abdirahman Yussuf, Abdirahman Yusuf, Ahmad Abdulnassir Ahmad and Kayachith.

Defendants also cite large time gaps in the Government's proof of any sexual activities involving any Jane Does Two and Five. For Adan's 1999-2000 cited recruitment of Jane Doe Five, Defendant Yusuf is not charge with any acts in the conspiracy until 2007 with Jane Doe Two. The activities involving Jane Doe Two were from November 2006 through May 2007 and later from April 24, 2009 through April 28, 2009. Defendants note that after July 2007, there was not any evidence of Jane Doe Two's sex activity with these Defendants. Jane Doe Two admitted that she did not engage in any prostitution activities during this two year time period. Jane Doe Two testified that she did not discuss prostitution with Defendant Haji Osman Salad, her boyfriend, prior to April 25, 2009. There were Internet communication with Jane Doe Two by Defendant Haji Salad who is Jane Doe Two's boyfriend. Defendant Kayachith is not mentioned as being with Jane Doe Two until April 24, 2009.

In its response to Yusuf' motion for acquittal, the Government describes the factual predicates for the single conspiracy: "Defendant[s] Mohamed Sharif Omar and Liban Sharif Omar are the common threads running through the conspiracy. Mohamed Omar Sharif trafficked [Jane Doe Five]. Mohamed Sharif visited 964 Village Hills Drive looking for girls. Mohammed and Liban plotted to obstruct [Jane Doe Two's] parents from coming to Nashville. Liban rented a room to further the sex trafficking of [Jane Doe Two]. Yusuf was one of the Defendants who

brought [Jane Doe Two] from Minnesota to Nashville for the purpose of sex trafficking. Defendant [Yusuf] has made no argument or submitted any proof that he has ever withdrawn from a conspiracy. Thus, there is enough evidence to support a finding that a single conspiracy existed and Defendant's claim should be denied." (Docket Entry No. 2577 at 9). In opposition to Defendant Kayachith's motion for new trial on this multiple conspiracies contention, (Docket Entry No. 2854), the Government cites to its earlier memoranda on the defense severance motions. Id at 1. After a review of the latter submissions, the detailed response cites the Defendants' participation in a "venture" as defined in 18 U.S.C. § 15(e)(5) and referenced in Section 1591(a)(2). At the trial, the jury acquitted all Defendants on the venture theory in Count Two.

As to this multiple conspiracies contention, the Second Superseding Indictment in this action charges two counts of conspiracy that were tried. The core of the two conspiracy counts involving thirty defendants, was in sum, that the Defendants:

### Count One

did combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury, to recruit, entice, harbor, transport, provide, obtain, and maintain by any means a person knowing and in reckless disregard of the fact that the person had not attained the age of 14 years and had not attained the age of 18 years and would be caused to engage in a commercial sex act, and knowing and in reckless disregard of the fact that the person had not attained the age of 18 years and that means of force or fraud or a combination of such means would be used to cause a person to engage in a commercial sex act in violation of Title 18, United States Code, Section 1591(a)(1).

### Count Two

did combine, conspire, confederate and agree with each other and others known

and unknown to the Grand Jury, to benefit financially and by receiving anything of value, from participation in a venture which engaged in an act of recruiting, enticing, harboring, transporting, providing, obtaining, and maintaining by any means a person knowing and in reckless disregard of the fact that the person had not attained the age of 14 years and had not attained the age of 18 years would be caused to engage in a commercial sex act and knowing and in reckless disregard of the fact that the person had attained the age of 18 years and that means of force or fraud or a combination of such means would be used to cause a person to engage in a commercial sex act in violation of Title 18, United States Code, Section 1591(a)(2).

(Docket Entry No. 591, Second Superseding Indictment at 7-8, 24). The second conspiracy count charged a conspiracy to participate in a "venture" to benefit from the sexual trafficking of minor females. As to Count Two, according to the Government's lead counsel: "It's the same acts that make up the conspiracies." (Docket Entry No. 2645, Transcript at p. 2623). As stated earlier, the jury acquitted these Defendants on Count Two.

Count One of the Second Superseding Indictment listed as victims minors Jane Doe One through Four, (Docket Entry No. 591, Second Superseding Indictment at 8-21), but of these victims, only Jane Doe Two testified at trial. Jane Doe Five testified that Defendant Abdifatah Jama Adan enticed her to prostitution with promises of a better life in 1999-2000 in Minnesota. According to Jane Doe Five, in 2000 Defendant Dahir Ibrahim traveled to Minnesota from Nashville looking for girls to take back to Nashville and asked Jane Doe Five if she wanted to travel to Nashville for prostitution. Jane Doe Five decided to move to Maryland and later moved to Nashville to be with her mother. The Government did not prove that Ibrahim ever actually secured and transported any minor girls from Minneapolis to Nashville nor any proof of the ages of any girls. Jane Doe Five opined as to their ages of females at Defendant Fadumo Farah's apartment in Nashville where Jane Doe Five reconnected with Adan and Defendant Fadumo

Farah. Jane Doe Five testified that Fadumo Farah operated a prostitution ring at her apartment, but the jury acquitted Defendant Fadumo Farah of any such conspiracy. At trial, there was not any proof tying Defendant Kayachith or Yusuf or Fahra to Jane Doe Five or Adan or Fadumo Farah.

Jane Doe Two testified that on April 25, 2009 she overheard Haji Salad, Abdullahi Afyare, and Liban Sharif Omar planning a trip to Nashville. In response to government's counsel's questioning about this conversation, Jane Doe Two testified that Andrew Kayachith and Abdikarim Ali were present, but did not refer to Kayachith participating in this conversation. The jury acquitted Ali. Yet, Jane Doe Two then testified that throughout the day she was driven around in alleys and Haji Salad, Abdullahi Sade Afyare, and Abdikarim Osman Ali were driving looking for people and calling people to see if they wanted to have sex with Jane Doe Two in exchange for money. Jane Doe Two testified "AK", Kayachith, was driving the vehicle. Neither Mohamed nor Liban Omar are tied to this latter activity. Jane Doe Two then testified that she engaged in sex with ten people in which cash money was exchanged. As stated earlier, this testimony differed from Jane Doe Two's prior statements about April 25th that did not contain any reference to sex trafficking on April 25th. In any event, Jane Doe Two described Defendant Haji Salad as the person who collected the money. For the remainder of April 25, 2009, Jane Doe Two is with Yassin Abdirahman Yusuf. On the morning of April 26, 2009, Jane Doe Two had sex with Biggie without any exchange of money. Kayachith was at the garage where the sex act occurred. On the morning of April 26th Jane Doe Two testified that Abdullahi Afyare contacted a person named "AZ" as a potential purchaser of sex acts, but that sexual act did not occur.

Jane Doe Two testified that reason she engaged in sex the weekend of April 24, 2009 was because Haji Salad, her boyfriend told her to have sex with them and he was already mad at her so she was trying to please him. The undisputed fact is that Jane Doe Two's sex with the gang members was free. From April 27 through April 28, 2009, Andrew Kayachith is one of five persons who traveled from Minnesota to Nashville, Tennessee with Jane Doe Two.

As another tie, the Government cites a jail telephone transcript between Defendants Haji and Liban Omar about preventing Jane Doe Two's family coming to Nashville. Although the transcripts reflect Haji telling Liban Omar to get his brother to talk to Jane Doe Two's family there is not any proof that anyone did so. Further, Mohamed Sharif Omar does not affirmatively state that someone should prevent Jane Doe Two's parents from coming to Nashville. There is a point at which Defendant Salad and Defendant Muhiyadin Hussein Hassan discuss the need for Mohamed Sharif Omar to speak with the parents because Mohamed Omar "is really good with the family." (Docket Entry No. 2636, at p. 2131). Yet, this dialogue amounts to third-party discussion. The jail transcripts also reflect Mohamed Omar castigating Defendant Salad for putting himself in a position to be arrested with Jane Doe Two in Nashville, but the language does not connote conspiratorial behavior, only rebuke.

> **Mohamed:** What did I tell you that day? Didn't I tell you to leave, stupid? Do you remember?
>
> **Salad**: Yeah, man. You are the one that put us there.
>
> **Mojo:** Fuck you, man. Didn't I tell you, let's go, let's get out of here. Didn't I tell you that?

(Docket Entry No. 2636, at p. 2121).

The jail transcripts do reveal Mohamed Omar's brothers Defendants, Liban Omar and

Abdifatah Sharif Omar ("British"), affirmatively expressing intentions of talking to Jane Doe Two's parents, but the same is not true of Mohamed Omar.

> **Liban:** We will talk to her family. Her family will be talked to.
>
> **To British:** You are going to talk to her family; right?
>
> **British:** Yes, I am calling them right now.
>
> **Liban:** We will talk to the girl's family. There you go.

(Docket Entry No. 2636, at p. 2101).

The jail transcripts illustrate Liban Omar's willingness to block Jane Doe Two's parents from coming to Nashville, but Liban Omar does not provide the Government with a conspiratorial link to Jane Doe Five. Mohamed Omar is the person who allegedly approached Jane Doe Five about engaging in commercial sex, but the jury rejected her testimony. The Government also relies on Liban and Mohamed Omar's familial relationship in asserting that Liban and Mohamed worked together to keep Jane Doe Two's family from coming to Nashville. The government asserts that when Liban Omar says "we will talk to the girl's family" in the above conversation, he means that all of the brothers will do so. The Government asserts that the jail telephone transcripts reveal that Liban Omar would get both of his brothers to talk to Jane Doe Two's family.

> Liban Omar, through these jail tapes, is discussing, we need to make sure the family – and I will get my brothers, British . . . and [Mohamed], and we'll talk to the family. We know members, and if we can keep them from coming to court, things will get dismissed. That is the connection. That is flows through these people. They are all associated, not only by inference, but in fact. And that is the association. The venture.

(Docket Entry No. 2636, at p 2196). To conclude that the "we" Liban is speaking of above

includes Mohamed Omar is speculative as to whom is included in "we." The Government's contention that Mohamed Omar is a common thread in a overarching single conspiracy relies on the premise that "Mohamed and Liban plotted to obstruct Jane Doe Two's parents from coming to Nashville," but the Government did not prove how or when they "plotted." (Docket Entry No. 2577, at 9).

The Government also points to a jail phone conversation exchange between Mohamed and Liban Omar where Mohamed tells Liban that the police know "everything," to buttress its argument for Mohamed Omar's centrality in the conspiracy. The following two excerpts provide two pertinent exchanges:

**Mohamed**: They even know that you are behind everything.

**Liban**: Me?

**Mohamed**: Yes.

**Liban**: Who told you that?

**Mohamed**: You just keep saying who told you? Who told you? It was on TV.

**Liban**: You are lying.

**Mohamed**: I swear to God, I'm not lying.

(Docket Entry No. 2636, at p 2247).

**Mohamed**: I'm not lying to you. Your friend's situation right now, they are kind of digging everything out. I will see what happens. They even said you were the leader.

**Liban**: They said my name?

**Mohamed**: Yes, that you are behind the wheels, you know?

(Docket Entry No. 2636, at p 2252). According to the Government, these exchanges illustrate that Mohamed Omar is a fully integrated member of the sex trafficking of Jane Doe Two to Nashville. The excerpts, however, fail to prove that Mohamed Omar played any role in Jane Doe Two's coming to Nashville (i.e., the "situation"), nor to describe the "common thread" of the conspiracy.

At the time of these telephone calls, the outstanding charges against the Defendants were contributing to the delinquency of a minor, Jane Doe Two, not prostitution. Jane Doe Five did not mention any of these Defendants as having any ties to the 964 apartment in Nashboro Village. There was not any evidence that the girls at the Nashboro Village residence were underage and were sexually trafficked. By its verdict on Fadumo Farah, the jury did not credit Jane Doe Five that would include Jane Doe Five's testimony about Adan and Mohamed Sharif Omar. As to Liban Sharif Omar renting a room for Jane Doe Two on April 24th, there is not any evidence of sexual trafficking of Jane Doe Two on that occasion.

The longstanding Sixth Circuit rule is that while a single conspiracy does not become multiple conspiracies simply because each member of the conspiracy does not know every other member, **it is necessary to show that each alleged member "agreed to participate in what he knew to be a collective venture directed toward a common goal."** United States v. Warner, 690 F.2d 545, 549 (6th Cir.1982) (emphasis added). In addition, the Sixth Circuit has "found single conspiracies even where the connections between the co-conspirators were minimal." United States v. Swafford, 512 F.3d 833, 842-43 (6th Cir. 2008) (citing United States v. Kelley, 849 F.2d 999, 1003 (6th Cir.1988)). Moreover, "'[w]hether single or multiple conspiracies have been established is usually a question of fact to be resolved by the jury ... and [is] to be

30

considered on appeal in a light most favorable to the government.'" United States v. Warman, 578 F.3d 320, 342 (6ᵗʰ Cir. 2009) (quoting United States v. Smith, 320 F.3d 647, 652 (6ᵗʰ Cir. 2003)).  Yet, under Sixth Circuit precedent, if the record establishes multiple conspiracies, then reversal of a conviction is required. Swafford, 512 F.3d at 842.  A district court has considered motions for acquittal under Rule 29 on the issue of whether the Government's evidence proved multiple or single conspiracies. United States v. Mayweather, Nos. 94-1414, 94-1530, 94-1482, 94-1705, 94-1483, 57 F.3d 1071, 1995 WL 364220, at *3 (6ᵗʰ Cir. June 16, 1995).

Under the applicable law, the prejudices or evils to be avoided with multiple conspiracies are, as the Supreme Court warned, charging large numbers of defendants in a criminal conspiracy charge such that " as [the conspiracy] is broadened to include more and more, in varying degrees of attachment to the confederation, the possibility for miscarriage of justice to particular individuals becomes greater and greater" Kotteakos v. United States, 328 U.S. 750, 776 (1946). The Supreme Court also warned of piling inference upon inference.  Swafford, 512 F.3d at 843 (citing Direct Sales Co. v. United States, 319 U.S. 703, 711 (1943) (**"[C]harges of conspiracy are not to be made out by piling inference upon inference, thus fashioning ... a dragnet to draw in all substantive crimes."**)).  Thus, the purposes of the prohibition of proof of multiple conspiracies are "'to prevent the prosecution from convicting the defendant of a different offense, not a lesser variation of the charged offense'" and impose "'guilt to an individual defendant involved in one conspiracy from evidence incriminating defendants in a conspiracy in which the particular defendant was not involved.'"  Warman, 578 F.3d at 342 (quoting United v States v. Hughes, 505 F.3d 578, 587 (6ᵗʰ Cir. 2007) and United States v. Levine, 569 F.2d 1175, 1177 (1ˢᵗ Cir. 1978)).

If the Government's proof established multiple conspiracies instead of the charged single conspiracy, then the Defendants' convictions must be set aside. In <u>Swafford</u>, the Government indicted the defendant in a single conspiracy to manufacture methamphetamine. 512 F.3d at 838. The Sixth Circuit reversed the defendant's conviction for conspiracy because the Court determined that the proof showed multiple conspiracies, not a single conspiracy. <u>Id</u>. at 841. On the issue of whether the Government's proof established a single conspiracy or multiple conspiracies, the Sixth Circuit stated:

> Even viewing the evidence in the light most favorable to the government, the government failed to prove a common goal as between the customers, a necessary element of a single conspiracy charge. That is, the government's metaphorical argument that this was a "wheel conspiracy" (or "hub-and-spoke" conspiracy)-wherein the defendant served as the hub connected to each of the customers via a spoke ( *i.e.* provision of iodine)-fails because no common goal or enterprise existed. As the Supreme Court described in <u>Kotteakos</u>, **"without the rim of the wheel to enclose the spokes," a single, wheel conspiracy cannot exist but instead is a series of multiple conspiracies between the common defendant and each of the other defendants. <u>Kotteakos</u>, 328 U.S. at 755, 66 S.Ct. 1239. "A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction."** <u>Dickson v. Microsoft Corp.</u>, 309 F.3d 193, 203 (4th Cir.2002); <u>see also</u> <u>United States v. Chandler</u>, 388 F.3d 796, 808 (11th Cir.2004) **("for a wheel conspiracy to exist, those people who form the wheel's spokes must have been *aware* and must do something in furtherance of some single, illicit enterprise")** (emphasis in original) (citation omitted). Here, we have exactly this type of rimless conspiracy. **The government failed to prove that the methamphetamine cooks were acting in furtherance of a common goal or that there was any significant interdependence among them. <u>See</u> <u>Chandler</u>, 388 F.3d at 811. Consequently, there is a variance between the crime charged (a single conspiracy) and the crime proved (multiple conspiracies).**
>
> **Finding a variance does not mandate a reversal; in order for the variance to constitute reversible error, a defendant must at the very least show that this variance prejudiced him. <u>See</u> <u>Caver</u>, 470 F.3d at 237 (a variance is not *per se* prejudicial). "Where the evidence demonstrates *only* multiple conspiracies, a**

**defendant is prejudiced if the error of trying multiple conspiracies under a single indictment substantially influenced the outcome of the trial.**" *Id.* (citing Kotteakos, 328 U.S. at 765, 66 S.Ct. 1239) (emphasis in original).

This case does not present the two most problematic forms of prejudice: (1) where the defendant is unable to present his case and is "taken by surprise by the evidence offered at trial," United States v. Budd, 496 F.3d 517, 527 (6th Cir.2007) (quoting Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)), or (2) where the defendant is "convicted for substantive offenses committed by another." United States v. Friesel, 224 F.3d 107, 115 (2d Cir.2000). Swafford had notice of the crimes charged against him and was not convicted for substantive crimes committed by another. But this observation does not end the enquiry, for as the Second Circuit describes, prejudice may also exist where " 'spillover' [occurs] because of a large number of improperly joined defendants." Id. Indeed, **the possibility of prejudice resulting from a variance *increases with the number of defendants* tried and the number of conspiracies proven.**" United States v. Bertolotti, 529 F.2d 149, 156 (2d Cir.1975) (emphasis added) (citing Blumenthal v. United States, 332 U.S. 539, 559, 68 S.Ct. 248, 92 L.Ed. 154 (1947)). The sale of iodine to many unrelated customers is no different from the sale of birdseed to many birdwatchers or the sale of other products at retail to many users who are unconnected to each other. **Where there is no connection between users of the same product but the factfinder mistakenly believes there is a union of interest and criminal intent and an agreement to coordinate activity, the harm to the public will appear to be greater and the participants more culpable. Here, the appearance of coordinated criminal activity appears more culpable than individual sales, implicating the Supreme Court's long-standing admonition that "charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning ... a dragnet to draw in all substantive crimes.**" Direct Sales Co. v. United States, 319 U.S. 703, 711, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943).

Id. at 842-43 (footnotes omitted).

Here, the Government contends that this sex trafficking conspiracy is a "chain conspiracy" that is usually associated with drug conspiracies. In instances of a "chain conspiracy,"

**"[f]or conviction, [the defendant] must have been shown to have agreed to participate in what he knew to be a joint venture to achieve a common goal. However, actual agreement need not be proved. Drug distribution conspiracies are often 'chain' conspiracies such that agreement can be**

**inferred from the interdependence of the enterprise.** One can assume that participants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell."

Id. (quoting United States v. Bourjaily, 781 F.2d 539, 544 (6th Cir.1986)). **Mere association with conspirators is insufficient to demonstrate participation in a conspiracy.** Gibbs, 182 F.3d at 422. **Likewise, the government generally cannot establish a defendant's agreement to participate in the conspiracy based solely on a buyer-seller relationship.** United States v. Anderson, 89 F.3d 1306, 1310 (6th Cir.1996). "However, **additional evidence beyond the mere purchase or sale of drugs, such as evidence of repeat purchases or some enduring arrangement that implies knowledge of the scope of the conspiracy may support a conspiracy conviction.**" United States v. Layne, 192 F.3d 556, 568 (6th Cir.1999), cert. denied, 120 S.Ct. 1443 (2000).

United States v. Brown, No. 97-1618, 221 F.3d 1336, 2000 WL 876382 at *3-4 (6th Cir. June 10, 2000).

As the Sixth Circuit later observed, the chain conspiracy involves proof of vertical structure with proof of significant interdependence among participants and large quantities of drugs.

Like many legitimate industries, **the distribution of drugs from suppliers, through middlemen, to the end consumer often assumes a vertical pattern of distribution, where each successive distributor sells a lower volume to any particular customer. Where drugs are concerned, this can form a "chain" conspiracy where an agreement to supply drugs to a given area can be inferred from the interdependence of the enterprise.** See id. ("'One can assume that the participants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell.'" (quoting United States v. Spearman, 186 F.3d 743, 746 (6th Cir.1999))). That said, **the agreement to enter into a transaction, which must by definition exist between a willing buyer and a willing seller, is not equivalent to the agreement needed to support a conviction for conspiracy.** Gibbs, 182 F.3d at 421. **Instead, a conviction must be based on evidence from which a rational trier of fact could find that the defendant had knowledge of the conspiracy itself, and purposefully joined the conspiracy.** See United States v. Grunsfeld, 558 F.2d 1231, 1235 (6th Cir.1977). **This can be inferred through circumstantial evidence,** Henley, 360 F.3d at 513,

34

**including evidence of repeated purchases, or evidence of a large quantity of drugs.** United States v. Martinez, 430 F.3d 317, 333 (6th Cir.2005), cert. denied, 547 U.S. 1034, 126 S.Ct. 1603, 164 L.Ed.2d 324 (2006) (citing United State v. Brown, 332 F.3d 363, 373 (6th Cir.2003)).

United States v. Caver, 470 F.3d 220, 233 (6th Cir. 2006) (emphasis added).

As these principles are applied here, the Government's proof does not establish any characteristics of a vertical distribution scheme. There is not evidence of an "enduring arrangement" nor the "significant interdependence" of the members of the alleged conspiracy. The Government's proof does not show interaction of these Defendants with Adan or Mohamed or Liban Omar or Fadumo Farah to achieve an overall goal. The jury's verdict acquitting Fadumo Farah of sex trafficking at the Nashboro Village residence bars any concerted activity with these Defendants. The acquittals of Defendants: Ahmad Abnulnasir Ahmed, Musse Ahmed Ali, Fadumo Mohamed Farah, Dahir Nor Ibrahim, and Mohamed Ahmed Amalle on Counts One and Two; and Defendants Fatah Haji Hashi and Mohamed Ahmed Amalle on Counts One, Two, Twelve and Thirteen necessarily means there was not any interdependence of those Defendants and these Defendants. Thus, aside from the Second Superseding Indictment charging two separate conspiracies, the jury's verdict of acquittal on the second count, based on the same facts as Count One, necessitates the conclusion that the Government's proof established multiple conspiracies.

Moreover, these isolated acts of these Defendants and the acquitted Defendants do not evince the large scale activities associated with a chain conspiracy. Most of the actual sex acts with Jane Doe Two were of a non commercial nature. The specifics of cited commercial sex acts are the 2006 incident at Farah's apartment and the April 25 alley sales of Jane Doe Two for

money and the exchanges of liquor and marijuana on one occasion during that time period. The Government's proof of the purpose of the Nashville trip as for sexual exploitation of Jane Doe Two is contradicted by Jane Doe Two's initial statements to Metro officers and Weyker about the purpose of the trip. Jane Doe's testimony also conflicts with the testimony of Hughes, a government witness, who testified under a grant of immunity that the Defendants were not engaged in prostitution or he would have known about it. As Caver explains, evidence of a willing agreement to engage in isolated conduct or transaction is not evidence of a larger agreement to join a large enterprise of sex trafficking, as in a drug distribution conspiracy, with operators at different levels. 470 F.3d 220, 233. Moreover, the jury acquitted all of the Defendants on Count Two that was the "venture" concept of the Defendants' alleged concerted conduct.

Here, the Government's proof of a conspiracy is more akin to the "wheel conspiracy" or "hub-and spoke conspiracy" where a defendant or defendants at the hub are connected to others or spokes of the wheel. United States v. Galan, 436 Fed. Appx. 467, 469 (6th Cir. 2001) (citing Swafford, 512 F.3d at 842). From the Court's analysis of the Government's proof, there is not any evidence of discernible "hub", but rather the Government's proof is of different and unconnected groups of persons acting with different females at different times in different cities and states. To be sure, there are references to Defendants as members or associates of the Somolia Outlaws or Somalia Mafia mostly through acts of displaying gang signs. Yet, this action presents the very problems that the Supreme Court warned about in charging large numbers of defendants in a criminal conspiracy charge namely that " as [the conspiracy] is broadened to include more and more, in varying degrees of attachment to the confederation, the possibilities

for miscarriage of justice to particular individuals becomes greater and greater." <u>Kotteakos v.</u>

<u>United States</u>, 328 U.S. 750, 776 (1946). The Supreme Court also warned of piling inference

upon inference. <u>Swafford</u>, 512 F.3d at 843. The Court notes that the jury acquitted all the

Defendants on Count Two of any conspiracy/venture to exploit minor females for commercial

sex trafficking that involves the same facts as in Count one. The jury's verdict acquitting six of

the Defendants and acquitting all Defendants of the Count Two conspiracy, as well as the

Government's charge of two conspiracies, actually support the Defendants' multiple conspiracies

theory.

The Government further asserts that even if the Defendants proved "that a variance

resulted in guilt transference, typically any danger of prejudice can be cured with a cautionary

instruction to the jury that if it finds multiple conspiracies, it cannot use evidence relating to one

conspiracy in determining another conspiracy. <u>United States v. Hughes</u>, 505 F.3d 578, 587 (6th

Cir. 2007) (citing <u>United States v. Blackwell</u>, 459 F.3d 739, 762 (6th Cir. 2006)).

The Court's multiple-conspiracies jury instructions in this action included cautionary

language, while avoiding "confusing, misleading, and prejudicial" statements of law by clearly

stating that the jury must find that Defendant participated in the conspiracy alleged in the Second

Superseding Indictment to convict Defendant of conspiracy. <u>Blackwell</u>, 459 F.3d 739, 762. In

pertinent part, the Court's multiple-conspiracies instruction read:

> To convict any one of the defendants of the conspiracy charge, the government must convince you beyond a reasonable doubt that the defendant under consideration was a member of the conspiracy charged in the Second Superseding Indictment. If the government fails to prove this, then you must find that defendant not guilty of the conspiracy charge, **even if you find that he or she was a member of some other conspiracy. Proof that a defendant was a member of some other conspiracy is not enough to**

> **convict.** Charges of conspiracy are not to be made out by piling inference
> upon inference, thus fashioning a dragnet to draw in all substantive crimes.

(Docket Entry No. 2659, Trial Transcript of Final Jury Instructions, "Multiple Conspiracies Claims," at 181-182) (emphasis added).

Yet, the lynchpin of this issue does not, as the Government contends, rest upon proper jury instructions alone. While the Court's instructions may have dutifully admonished the jury about using evidence of a conspiracy proven by the Government that was not included in the Second Superseding Indictment to convict the Defendants, this does not end the Court's inquiry into the curative nature of the jury instructions. The Government here fails to address the Sixth Circuit's contention in Blackwell that "the more evidence presented at trial that is unrelated to the defendant's conduct, or a conspiracy in which the defendant took part, the less likely instructions are to cure the danger of guilt transference." Blackwell, 459 F.3d at 762.

In Blackwell, the Sixth Circuit upheld the defendant's insider trading conspiracy conviction because the Court found the defendant had not been prejudiced at trial. The Court considered the number of conspiracies the evidence establishes, the number of non-conspiratorial co-defendants tried with defendant, and the size of the conspiracy alleged in the indictment in determining whether a variance was prejudicial. See id. (citing Kotteakos, 328 U.S. at 766). Following Blackwell's blueprint, the Court here concludes that the Defendants were prejudiced by: (1) the Government's proof of five conspiracies; (2) that the Second Superseding Indictment charged thirty Defendants for conspiracies spaning almost ten years; and (3) the jury acquitted all the Defendants on Count Two, the Government's "venture" theory of the Defendants' alleged concerted conduct that relies on the same facts as Count One. Unlike Blackwell, where the

conspiracy involved far fewer than thirty defendants, and a much more tightly linked group of defendants, the single conspiracy indictment in this action cannot be saved by carefully crafted jury instructions alone. Id. at 749.

As a conceptual matter, the Court finds it difficult to conclude proof of a single conspiracy when the Second Superseding Indictment actually charges two conspiracies. From the Court's review, there was not any proof that the thirty Defendants, including these Defendants were "acting in furtherance of a common goal or that there was any significant interdependence among them." Swafford, 512 F.3d at 842. For these reasons, the Court concludes that under Swafford, the Defendants' motions for a dismissal on grounds of the Government's proof of multiple conspiracies rather that the single conspiracy in the Second Superseding Indictment should be granted. If the Court is in error on the issue of multiple conspiracies, the Defendants remain entitled to a new trial for the reasons set forth below.

### D. Yusuf's Motions to Dismiss and for a New Trial

During the trial of this action the Defendant Yusuf made several oral motions and filed two motions to dismiss (Docket Entry Nos. 2280 and 2296) based upon the Government's violation of discovery Orders citing the Government's late disclosures of Brady, Giglio and Jencks Act materials during trial. In his motion for a new trial, Yusuf presents a related claim that based upon the Government's belated production of discovery information, Yusuf has recently discovered new evidence that Jane Doe Two was born in late 1990 or early 1991 so that she was over the age of 18 at the time of the April 24-29, 2009 events that form a basis for Yusuf's conviction. Yusuf also cites the Government's contentious opposition to his earlier motion for DNA testing that established his assertions about Jane Doe Two's stated age as false,

the identity of her biological father as false and that affidavits submitted by Jane Doe Two's mother and purported stepfather, who is her biological father, are false.

As to the violations of the discovery Orders, given the complexity of this action and the number of Defendants, the Court ordered the Government to produce discovery materials 42 days prior to trial. Yet, during trial the Government produced more than 6,000 pages, including the lead agent's notes. The Government lead counsel who is responsible for discovery stated that he did his best. For the cited new evidence about Jane Doe Two's age, the Government contends that the affidavits submitted are inadmissible evidence and that the asserted facts are not new because Yusuf had the opportunity to call Jane Doe Two's mother, but elected not to do so.

### 1. The Newly Discovered Evidence

Yusuf asserts that based upon late information produced by the Government at trial, he has learned since conclusion of the trial from members of the Somalian community that a cousin in Jane Doe Two's family stated that Jane Doe Two was born in 1990 or early 1991. Asha Mohamed, Jane Doe Two's mother's cousin stated to a friend that she was present for Jane Doe Two's birth and cared for Jane Doe Two and her mother after Jane Doe Two's birth. In addition, Yusuf acquired information that Jane Doe Two's parents actually separated in 1991 and did not see each other until 1996 in the United States.

After describing a typographical error in an earlier affidavit, Hibo Ali Caabi, the friend to whom Asha Mohamed made these statements, states, in pertinent part:

1. I am Hibo Ali Caabi and I reside in Nairobi, Kenya.

2. .... I am the birth mother of Shararke Adbi Rashid and gave birth to him at the Nairobi Hospital in Kenya on January 23, 1993 and not January 23, 1994 as stated in my first affidavit.

40

3. My son's goes by the first name of Sharmarke and not Mohamed as stated on his birth certificate. He has always been known as Sharmarke. Due to complications at birth I was unable to convey to the hospital my wish for this name.

4. Sometime in late May 2012 after I had signed my first affadavit, a friend of mine, Asha Mohamed, came to visit me in Nairobi. At my house we discussed this case that had recently ended in America. **Asha Mohamed is a cousin of Ruux Shiik Yusuf [Jane Doe Two's mother's real name] and presently resides in England. Asha Mohamed told me that she was present at the birth of both of Ruux Shiik Yusuf's daughters. She told me that both daughters were born in Somolia and that the older daughter, Hani, was born in 1989 and younger daughter, Ayan, was born in late 1990 or early 1991. Asha Mohamed stated she stayed several weeks with Ruux Shiik Yusuf after each birth to help take care of the newborns.**

5. **Asha Mohamed told me that Ibrahim Mohamed [Jane Doe Two's biological father] and Ruux Shiik met in Qoryoole Somali in 1987 and married that same year. After the births of the two daughters the family moved back to Ruxx Shiik Yusuf's place of birth in Ethiopia. Ibrahim Mohamed Hassan and Ruux Shiik Yusuf separated due to marital problems in 1991. Ibrahim Mohamed Hassan moved to Nairobi Kenya in 1991 leaving his family in Ethiopia. Ibrahim Mohamed Hassan did see his wife and daughters again until they came to America in 1996.**

(Docket Entry No. 2875-2 at 1-2) (emphasis added).

In addition, Yusuf presented proof from Mohamed Abdi Wahab who is listed as Jane Doe Two's brother on her mother's immigration file. In his affidavit, Wahab states that Hibo Ali Caabi is, in fact, his biological mother and he was added to Jane Doe Two's mother's refugee application, as her son, to fit the family profile for refugee status.

1. I am Mohamed Abdi Wahab and I reside in Minneapolis Minnesota.

2. My biological mother is Hibo Ali Caabi who resides in Nairobi Kenya. I was born in Nairobi and my true date of birth is January 23, 1993.

3. My birth name is Mohamed Abdirashid Abdi and my American name is Mohamed Abdi Wahab but I have always been called Sharmarke.

4. I immigrated to the United States with Safia Beledi and her two daughters in 1996. **I am not related to them. Safia Beledi needed a boy to fit the family list for Safia Beledi who was younger than Hani Wahab and older than Ayan Wahab. My age**

41

**was changed to fit the family profile. I am younger than Ayan Wahab.
I have no factual knowledge of exact age (handwritten and initialed)**

(Docket Entry No. 2875-1 at 1) (emphasis added).

In response to this proof, the Government contends that Caabi's and Wahab's affidavits are inadmissible hearsay and contain double hearsay. As hearsay, the Government argues that neither of these affidavits qualifies as new evidence. Moreover, the Government cites defense counsel's ability to call Jane Doe Two's mother as a witness at trial.

For this claim of newly discovered evidence, the Defendants must show: (1) that the cited evidence was discovered after trial; (2) that the cited evidence could not have been discovered earlier; (3) that the evidence is material, not cumulative or impeachment; and (4) the evidence could likely result in an acquittal. United States v. Syphis, 684 F.3d 622, 626 (6th Cir. 2012); United States v. Jones, 399 F.3d 640, 648 (6th Cir. 2005).

First, as to the admissibility of these affidavits, particularly Caabi's affidavit with the statements of Jane Doe Two's mother's cousin, Fed. R. Evid. 803 (19) provides, in pertinent part: "The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:"a statement of "reputation among a person's family... or among a person's associates or in the community- concerning the person's birth ... or similar facts of personal or family history." Federal Rule of Evidence 804(b)(4)(A) and (B) provide, in relevant part, that "[t]he following are not excluded by the rule against hearsay if the declarant is available as a witness: ... (A) the declarant's own birth ...(B) another person concerning any of these facts . . . ." Prior to the amendments to these Rules, a declarant was deemed unavailable if "[t]he proponent of her statement has been unable to secure her attendance by process or other

reasonable means" United States v. Pluta, 176 F.3d 43, 47-48 (6th Cir. 1999) (citing Ohio v. Roberts, 448 U.S. 56. 74-75 (1980)). In addition, where testimony contains multiple hearsay, "to be admissible each level of hearsay needs to fit under a hearsay exemption or exception." United States v. Cuesta, 1:06cr 40 AWL, 2007 WL 2729853 at *15 (E.D. Calif. Sept, 19,2007) (citing United States v. Arteaga, 117 F.3d 388, 396 n.12 (9th Cir. 1997)).

Applying these Rules and principles, regardless of the unavailability of Caabi and Asha Mohamed for trial, Rules 803 (19) and 804(b)(4)(B) would appear to allow the admissibility of these statements for purposes of the Defendant's motion for a new trial. The Defendants may secure these witnesses for trial by deposition or attendance in which any hearsay contentions would be moot. The Government has had or at a trial would have the opportunity to challenge these statements by calling Jane Doe Two's mother to test the reliability of this evidence.

To provide context for the analysis of the materiality of this evidence, the Jane Does and Defendants are refugees from Somolia. The Government relied upon their immigration records referred to as A-files. These A-files list the names of the refugees' sponsor, the applicant refugee and members of the applicant's family who would also be awarded refugee status. Among the data in the A-files is each person's date of birth and relationship to the applicant. Jane Doe Two was listed on her mother's A-file with a birth date of September 10, 1994 and listed her father as deceased. With belated disclosures by the United States and based upon his counsel's investigation, Yusuf filed a motion for DNA testing of Jane Doe Two's stepfather whom members of the Somalia community in Minneapolis stated was Jane Doe's biological father. The Government opposed Yusuf's motion as groundless and Jane Doe Two's mother and stepfather filed affidavits (signed by their counsel) denying that the stepfather was Jane Doe Two's

biological father and vigorously opposed Yusuf's motion for DNA testing. The Court granted

Yusuf's motion, and the DNA test result was that to a 99.99% certainty, Jane Doe Two's

stepfather is her biological father. Based upon his arrival in the United States, Jane Doe Two's

birth date in her mother's A-file was physically impossible and demonstrably false.

In earlier proceedings, other Defendants asserted that they were minors at the time of the

events at issue. After evidentiary hearings, the Court found that proof established the false and

highly unreliable nature of the information on these A-files. Refugee applicants fabricated birth

dates and listed persons who were not family members on their applications in their A-files. On

April 19, 2012, during the trial, Jane Doe Two's mother admitted that she was not the mother of

Mohamed Abdi Wahab, whom she listed on her application in her A-file as her son. (Docket

Entry No. 2502-1). In other instances, multiple children were given identical days as their birth

dates on the refugee applicant's A-file. In an earlier hearing, an immigration official testified that

such listings were unlikely to be true and unreliable from the face of the documents. The Court

deemed such proof to raise serious issues about the reliability of these A-files.

In addition, a year prior to trial, the Government was aware that Jane Doe Two's mother

submitted a false birth certificate for Jane Doe Two to Tennessee authorities seeking victim

benefits for Jane Doe Two arising out of the Nashville trip. Jane Doe Two's 2010 application for

victim benefits filed with Tennessee authorities contained a statement in which Jane Doe Two

actually listed her stepfather as her biological father with whom she was living. The documents

submitted to Tennessee officials were first produced during the trial. The purpose of this review

of earlier proceedings reveals that only after Government disclosures shortly before or during

trial did the Defendants learn relevant and crucial information about Jane Doe Two's birth date.

As to materiality of the Caabi and Whab affidavits, Jane Doe Two's age is a critical element of the Government's proof for a violation of 18 U.S.C. § 1951(a). Evidence from a family member or member of the Somalia community and Jane Doe Two's family friend about Jane Doe's birth is highly probative evidence. It must be remembered that on her website, Jane Doe Two listed her birth date as 1990, a fact consistent with Ahsa Mohamed's statement. Given that the Government did not produce the A-files until trial, the belated disclosures severely limited defense counsel's opportunity to investigate the information in those files during the trial. The presence of witnesses in Africa and England underscores the defense counsel's inability to discover this information prior to trial. This proof that Jane Doe Two was born in 1990 or early 19991 could likely result in an acquittal because the jury's verdict is based upon the Defendants' cited conduct with Jane Doe Two in late April 2009 when Jane Doe Two could have been 19 years old or 18 years old. Such proof, if accepted by the jury, would likely cause an acquittal given the age requirement for a conviction under Section 1951(a).

For these reasons, the Court concludes that Defendants Yusuf and Kayachith's motions for a new trial should be granted. As discussed below, the Court reaches the same conclusion based upon the Government's violations of the Court's discovery Orders that were designed to eliminate the problems posed by the Government's belated disclosures.

## 2. The Discovery Orders

In his oral and written motions to dismiss that also are based upon violations of the Court's discovery Orders (Docket Entry Nos. 2280 and 2296), Yusuf also contended that his counsel was unable to pursue these potential witnesses with exculpatory evidence given the Government's counsel's belated disclosures in violation of the Court's discovery Orders. As

examples, Jane Doe Two's statements to Tennessee authorities about the Nashville trip in 2009

that the lead Assistant United States Attorney signed and the Weyker rough notes are statements

of witnesses that qualify as Jencks materials and should have been produced 42 days prior to

trial, as ordered by the Court. Yusuf also contends that these materials include Brady and Giglio

materials.

On March 26, 2012, six days after commencement of jury voir dire and selection of a

jury, counsel for the Defendant Abdirahman Abdirazak Hersi filed a motion to stay the

proceedings, (Docket Entry No. 2108), citing the following recent disclosures of Jencks materials

from the Government:

### LIST OF RECENTLY PROVIDED JENCKS, DISCOVERY:

Immediately prior to trial, and during the trial, the government has provided the following
additional Jencks/discovery to the defense:

**Made Available after 3:00 p.m. Wednesday, 3/14/12**
Multiple Unredacted Police Reports Emails from/to Heather Weyker --**5081
pages**

**Provided to defense counsel during voir dire Wednesday, 3/21/12**
The 11/21/08 audio interview of JD2 by Heather Weyker

**Made available to defense counsel noon Saturday, 3/24/12**
Disc 1 – Rough notes of 7 law enforcement officers – **256 pages** Rough notes of
Heather Weyker – **927 pages**

Disk 2 – Criminal Histories of Witnesses – updated to identify those witnesses
who do not have criminal history.

Disk 3 – Recording of 7/28/09 Miranda interview of defendant Hersi (13).

Disk 4 – Jencks material – 2 phone calls between Heather Weyker and Fadumo
Osman on 1/30/12.

Disk 5 – Jencks material– phone calls between JD2 and Abdullahi Farah,

**(approximately 14.5 hours)**

Document – NCIC printout for Basim Sabri.

Id. at 3 (emphasis in the original).

Yusuf contends that based upon these late disclosures, his counsel's investigation and preparation was impeded because after trial, his counsel discovered exculpatory evidence for Yusuf about Jane Doe Two's actual age. As to specific nature and effects of these delayed disclosures, Yusuf contends, in sum:

(1) On April 12, 2012, during trial, Defendant Yusuf's counsel received Jane Doe Two's juvenile records and midway during Jane Doe Two's trial testimony, his counsel received Jane Doe Two's application to the Tennessee Victim's Compensation Fund for monetary benefits. For the latter, the Assistance United States Attorney signed for portions of the materials. This application reflects Jane Doe Two's statement that she was "abducted" for the Nashville trip, that is contrary to her prior statements to government agents. Jane Doe Two's juvenile intake record reflects her statement that she resides with her "biological parents" and she listed Ibrahim Mohamed Hassan as her father.

(2) Among the 5081 pages of emails produced by the Government on March 14 and 24, 2012, are reports in which Jane Doe Two told investigators that the purpose of the trip to Rochester was robbery, but at trial, Jane Doe Two testified that the purpose of the Rochester trip (or at least one of the purposes) was to go to an apartment for prostitution. According to Yusuf, trial is the first mention of the prostitution at a Rochester apartment allegation that has ever been mentioned. The prior government disclosures were that Jane Doe Two was offered for the sale as a sex slave to a stranger at a gas station in Rochester that counsel viewed as a moment of opportunity rather than a plan. Presumably, the Government knew that Jane Doe Two was going to make the "take me to an apartment for prostitution" statement and therefore should have provided the investigators' notes that are the subject of the lately produced emails.

(3) the Government's delayed disclosures contained Brady materials that impeded Yusuf's counsel investigation of Jane Doe Two's actual date of birth. Yusuf's counsel now has some proof that Jane Doe Two's birth date is 1990 that would make Jane Doe Two 19 years of age on the only actionable date of Yusuf's cited sex trafficking in 2009. Yusuf submitted an affidavit of Hibo Ali Caabi who states that Jane Foe Two's mother stated to her that Jane Doe Two was born in 1990. In

support of this contention, Yusuf cites his earlier contested motions for DNA testing that proved that Ibrahim Mohamed Hassan who arrived in the United States in August 1993 is the biological father of Jane Doe Two. This fact rendered false Jane Doe Two's birth date in her immigration and other records cited by the Government. The DNA test results also proved the falsity of the affidavits of Hassan and Jane Doe Two's mother filed in this action that Hassan is not Jane Doe Two's biological father. In addition the Government stipulated that Jane Doe Two's mother's immigration application falsely listed as her son, the son of Caabi. Yusuf's proof included documentary evidence that Jane Doe Two listed Hassan as her father on her Davidson County Juvenile form after she was taken into custody in Nashville in 2009.

A brief review of the record is necessary to provide context for the violations of the Court's discovery Orders. After extended proceedings on the Government's initial discovery production relating to the taping of privileged conversations and related issues, on May 10, 2011, the Court entered a discovery Order for the Government's pretrial disclosures of <u>Brady</u>, <u>Giglio</u> and the Jencks Act materials. The May 10th Order attached a prior Order of the Honorable Thomas A. Higgins, a distinguished Senior District Judge, in a complex criminal action with 34 defendants. <u>United States v Page</u>, 2:00cr0016. The United States did not challenge Judge Higgins's Orders in that complex action. The Court deemed its Order to be based on well-established constitutional principles as well as the Department of Justice's 2010 policy on <u>Brady</u> obligations of federal prosecutors requiring "actual review" of documents in a criminal action. See Docket Entry No. 607, Court's Memorandum at 20, citing <u>United States v. Salyer</u>, 2010 WL 3036444, at *3 (E.D. Cal. Aug. 2, 2010).

At an earlier April 26, 2011 hearing on the government's discovery production, the Government's lead counsel stated that the Government had produced "all of the material in the case that we have." (Docket Entry No. 703 at 85). The Government's lead counsel also stated: "The only thing they [defense counsel] don't have is the grand jury material in this case." <u>Id</u>.

Portions of at least two Defendants' grand jury testimonies were later produced or disclosed.

(Docket Entry No. 775 at 8 and Docket Entry No. 504 at 3-4).

On May 24, 2011, the United States moved to stay the May 10th Order to consider issues raised by the Court's Orders. For several reasons, the Court denied the motion, but extended the time for compliance given that all recordings had not been transcribed. The Court explained:

> First, from the Court's perspective, the Order on disclosures of Brady, Giglio, Jencks Act and Rule 404(b) materials was established by precedent in this district and precedents in the Sixth Circuit. Second, several Defendants are detained and time was of the essence to meet the interests of the Speedy Trial Act and to ensure defense counsel's trial preparation. Third, the Government's motion did not assert any harm by these disclosures. There was no assertion of any actual contact with any witness or family members. Orders have been entered prohibiting any such contacts by any Defendant who has been released. Fourth, the Government earlier represented that transcripts of the disks were already being prepared and in fact, the United States filed some voluminous transcripts on the detention appeals. The transcription of the jail recordings under the Court's Order would be what the Government was already preparing. The disks provided by the Government were not searchable and after consulting with Court technical personnel, the Court selected the best alternative disk format for the Court's en camera review.

(Docket Entry No. 964, Court's Memorandum at 6-7).

The United States later filed a position paper (Docket Entry No. 736) asserting its refusal to comply with the May 10th Order to produce transcripts of Defendants' recorded jail conversations as well as documents that qualify for disclosure under Brady, Giglio and the Jencks Act, 42 days prior to trial. The Government stated three core concerns: (1) the preparation of transcripts and disks of the jail transcripts in an alternative format; (2) the timing of the disclosures and (3) the compilation and disclosure of Brady, Giglio and Jencks material for each defendant. The United States asserted its intention to appeal the Court's May 10th Order and requested the Court to identify the sanctions the Court would impose for the Government's

failure to comply with the Court's Order. The United States also filed its motion to reconsider Fed. R. Evid. 404(b) disclosure deadlines arguing that the Order would exclude any Rule 404(b) evidence discovered after the deadline.

Defendants Ahmad Ahmad and Abdullahi Hashi filed responses to the Government's position paper, citing Sixth Circuit precedents that authorize pretrial disclosures of Brady, Giglio ane Jencks Act documents. (Docket Entry Nos. 746 and 752).

On June 24, 2011, the Court set a hearing on the Government's position paper and motion to reconsider because the Government's four page position paper contained citations and brief statements without any specificity or analysis. At the conclusion of that hearing, the Court announced its intention to file a draft Memorandum of authorities that supported its Order and invited counsel to show why those authorities did not support the Order. The United States filed its response with its original concerns and additional objections that were, in sum: (1) the Court lacks authority to enter these disclosure Orders tailored to each Defendant; (2) there was not any padding of discovery; (3) Brady and Giglio disclosures could not be required to be tailored to each Defendant; (4) Judge Higgins's prior Order is not precedent; (5) the United States did not have any "open file" for this action; (6) the United States has produced "obviously" Brady materials; (7) the discovery provided was labeled and organized; (8) the authorities cited by the Court in its Draft Memorandum are distinguishable; and (9) Minsky does not support a deadline for Rule 404(b) material (Docket Entry No. 775). Earlier, the United States agreed to provide Brady, Giglio, Jencks Act and Rule 404(b) materials "at least two weeks" prior to trial. (Docket Entry No. 703 at 103).

The Court set a hearing, and prior to the June 24, 2011 hearing, the Government revealed

that its earlier estimate of 20,000 to 25,000 pages of discovery production was expected to

exceed 35,000 pages of discovery materials to be produced by the Government. (Docket Entry

No. 775 at 23, 25). At the June 24th hearing, the Government's counsel's response was again that

"other than grand jury material statements and a few – with a few exceptions some other

statements" the Government had produced "all the material the United States has," (Docket Entry

No. 813 at 22), that included all Jencks material that was represented as produced in January and

May of 2011. Id. At the June 24, 2011 conference on discovery issues, government counsel

stated: "The Jencks material is the police reports." Id. at 69. There was an index to the 142 disks

that the Government produced containing these materials. Id. at 52. At that hearing, several

senior defense counsel with decades of experience in criminal defense in this Court described the

Court's Order as in accord with Orders of other Judges of this Court. Id. at 72.

In a Memorandum and Order dated November 3, 2011, the Court affirmed its May 10,

2011 Order and again required all supplemental Jencks and Brady materials to be produced 42

days prior to the trial. (Docket Entry No. 964, Memorandum at 30). The Court did not impose

any sanctions based upon the Government's counsel's statements that with few exceptions, Rule

404(b), Jencks and Brady materials had been produced. Id. at 29-30. The Government did not

appeal that Order.

On January 6, 2012, the Court conducted a pretrial conference to discuss various issues

for the upcoming March 20, 2012 trial. (Docket Entry No. 1028). Among the statements at that

conference was the Government's counsel's statement that: "The Jencks material is actually out

in the case." Id. at 14. On January 20, 2012, another pretrial conference was held in preparation

for the February 6, 2012 exhibit conference for the Defendants' review of all Government trial

exhibits and for deadlines on the time necessary for defense counsel to assess and file suppression motions. (Docket Entry No. 1286). After discussions with counsel, the Court set a deadline of February 21, 2012 and set suppression hearings for March 2, 2012. Id. at 7, 20.

Some defense counsel later contended that the Government's disclosures during trial included Brady, Giglio and Jencks materials. The Government's counsel's response was that with this voluminous discovery, he did the best he could on discovery production. Later, the Government argued that because Weyker was not a government witness, her 6,000 pages of rough notes are not Jencks materials subject to disclosure. Weyker was listed as a witness in the Government's list of trial witnesses. (Docket Entry No. 1864 at 9). Jane Doe Two's 2011 application to the Tennessee Crime Victim Fund that included a signed statement of the Government's lead counsel describing the April 2009 trip to Nashville, is also Jencks material. The juvenile records that were created and signed by Jane Doe Two very shortly after she and Defendants Kayachith and Yusuf were arrested in Nashville are Jencks material. These more than 6,000 additional documents are Jencks materials because as the Government's lead counsel stated at the June 24, 2011 conference on discovery issues that : "The Jencks material is the police reports". (Docket Entry No. 813 at 69). The late production of 6,000 documents is contrary to the prior representations of the Assistant United States Attorney in charge of discovery that the Defense counsel had been provided all Jencks materials

The Government's lead counsel's attempted to excuse this on the ground that Weyker was not a witness subject to the Jencks Act is erroneous. The Court's discovery Orders required a Jencks production based upon the list of Government witnesses. Jane Doe Two and Weyker were listed as witnesses in the Government's list of trial witnesses. (Docket Entry No. 1864 at 6,

9). Moreover, the bulk of these late disclosures are rough notes and messages of Weyker and other officers. For the lead agent in any criminal action, Local Criminal Rule 16.01(a)1g expressly requires the preservation of Weyker's rough notes and expressly imposes that responsibility on Government counsel. The failure to produce the lead agent's rough notes in this action is difficult to understand. Moreover, Local Criminal Rule 16.01(a)(2)a.1. expressly requires disclosure of any recorded statement of a defendant within 14 days from the defendant's arraignment. Here, the Government's noncompliance includes the March 24, 2012 production of Defendant Hersi's 2009 recorded statement.

For sanction for violations of discovery Orders in a criminal case, the Federal Rules of Criminal Procedure provides several options:

> (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
>
> (B) grant a continuance;
>
> (C) prohibit that party from introducing the undisclosed evidence; or
>
> (D) enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2)(A)-(D).

Here, continuances were granted, and the Defendants were given an opportunity to inspect these documents, some of which are cited as favorable to the defense. As to the prejudice from these belated disclosures, during trial, Defendant Yassin Yusuf filed a motion to dismiss for the Government's continuing violations of the Court's discovery Orders, citing the disclosures of Jane Doe Two's 2010 application for compensation from Tennessee authorities at trial for which the Government's lead counsel signed supporting papers in 2010. After trial, Defendant Yusuf

filed a motion for a new trial (Docket Entry No. 2502) based upon newly discovered evidence that Jane Doe Two was born in 1990 that would render her an adult at the time of the 2009 acts for which Yusuf was found guilty. This proof was acquired as a result of the Government's belated disclosures. Given defense counsel's lack of prior review of these more than 6,000 pages of materials. The Court concludes that these defense contentions possess merit.

Aside from Rule 16(d)(2), the Court has the inherent authority to impose sanctions for violations of its Orders, including the appointment of counsel to investigate and pursue contempt sanctions, if warranted. Young v. United States ex rel Vuitton et Fils S.A., 481 U.S.787, 796, 799 (1987). As the Supreme Court observed: "'If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the judicial power of the United States would be a mere mockery.' As a result, 'there could be no more important duty than to render such a decree as would serve to vindicate the jurisdiction and authority of courts to enforce orders and to punish acts of disobedience.'" Id. at 796 (quoting Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 450 (1911) (internal quotation marks omitted)). The Supreme Court also explained that "[t]he underlying concern that gave rise to contempt power was not, however, merely the disruption of court proceedings. Rather, it was obedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of the trial". Id at 798. In In re Smothers, 322 F.3d 438, 442 (6th Cir. 2003), the Sixth Circuit observed that "this inherent power", "grants courts the flexibility to equitably tailor punishments that appropriately fit the conduct". Id.

Here, as a factual matter, whether the government's noncompliance with the Court's

discovery Orders was the result of mere negligence or intentional is unclear. Brady disclosure obligations extend to government counsel, as reflected in the Supreme Court precedents cited in the Court's earlier ruling on the discovery Orders in this action. (Docket Entry No. 964, Memorandum 13-20). Local Criminal Rule 16.01(a)1g makes the rough notes of the agents in the case an express responsibility of government counsel. Here, the failure to produce the lead agent's rough notes is at best, most difficult to understand. Local Criminal Rule 16.01(a)(2) a.1 expressly requires disclosure of any recorded statement of a defendant within 14 days from the defendant's arraignment. Here, the noncompliance includes a 2009 recorded statement of Defendant Hersi that was not produced until after trial started. Further, on the eve of trial, Weyker's rough notes were produced, with one page containing references about Jane Doe Two's statements about finding guys "to have sex for money." Weyker did not testify.

In this complex action, the Orders requiring early production of Jencks materials is based upon precedents and prior practice in this district as confirmed by prior Orders and the experiences of seasoned defense counsel, including a former federal prosecutor. The production of 6,000 documents shortly before and during trial, is contrary to the Government's lead counsel's prior representations to the Court that the defense counsel had been provided all Jencks materials. This is a federal, state and local prosecution with multiple agents. Yet, these discovery obligations involve primarily the government's lead agent.[10]

---

[10] Earlier, the Court found serious issues about the testimony of Government's lead agent in this action. See Docket Entry No. 1392, Memorandum at 2-3. This concern arose again at a July 31, 2012 detention hearing reflecting her misrepresentation of the facts about the Defendant Abdifatah Sharif Omar that resulted in his release from detention under certain conditions. Finally, serious credibility issues arise from Jane Doe Two's testimony that involved the Government's lead agent.

As stated earlier, many of the documents at issue are from Minnesota police officers, including the Government's lead agent. These documents include critical documents that existed well before this action was filed. The casual and cavalier response from the Government's lead counsel who was responsible for discovery production, is disturbing. There was not any attempt to explain this extensive noncompliance with discovery Orders. Government's lead counsel's noncompliance poses significant case management issues for the Court in this and future complex criminal actions that would render Court's Orders a nullity.

To be sure, the Court earlier recognized that this is a complex action with ongoing developments and informed Government's counsel that if Jencks or Brady materials arose after the deadline for production, then with a showing of good cause, the Court would excuse noncompliance. (Docket Entry No. 813 at 30, 75-77). Here, the Government counsel did not make **any** effort to provide a reasoned explanation for the Government's failure to produce more than 6,000 documents, including critical documents of its lead agent that existed long before the Court's May 10, 2011 discovery Order. This noncompliance not only ignores Orders of the Court, but also imposed unnecessary and excessive costs upon the United States that has to compensate defense counsel for these indigent Defendants.

This is complex action with 30 Defendants, with witnesses in multiple cities in four states as well as two foreign countries and with criminal acts over the period of a decade. Given the scope of the lead Government's counsel's violations of the Court's discovery Orders and Local Rules, the defense counsel were in the extremely untenable position of investigating their defenses as the trial proceeded. The prejudice of these delayed disclosures is reflected by Yusuf's motion for a new trial based upon proof recently acquired after trial about Jane Doe

Two's birth in 1990 or early 1991 that cause Jane Doe Two to be 18 or 19 at the time of the Nashville trip in late April 2009. The Court considers unreasonable any expectation that defense counsel could have investigated and secured a witness in Africa or England for trial in this district within the time frame of the Government's belated disclosures during trial. This defense proof is material given that Jane Doe Two's age is an element of the offense. The delayed disclosures, effectively precluded securing such proof. Yusuf's counsel's discovery of the new information and securing an affidavit dated May 11, 2012 from a witness in Africa underscores the likelihood of prejudice to all Defendants impacted by Jane Doe Two's age.

If the Court's discovery Orders had been honored, defense counsel would have had a reasonable opportunity to present this proof. Here, Jane Doe Two's proof of her age is based upon what her mother told her and what Jane Doe Two's mother listed as Jane Doe Two's date of birth in the mother's immigration papers. These immigration papers for Jane Doe Two's birth date that is the basis for other public records, such as school and juvenile records, are admittedly false. As to the Government's contention that Defendant Yusuf could have called Jane Doe Two's mother and questioned her about Jane Doe Two's date of birth in the immigration file, given Jane Doe Two's mother's history of false statements, defense counsel could make a reasonable tactical decision not to call her as a defense witness, particularly without witnesses Caalbi and Asha Mohamed. The statements of Asha Mohamed, Jane Doe Two's mother's cousin's statements is corroborated by Caabi. Asha Mohamed could prove that Jane Doe Two's birth date is in late 1990 or early 1991. In addition Asha Mohamed or Caabi could testify about Jane Doe Two's father separating from his wife in 1991, consistent with a birth date of Jane Doe Two in 1990. Either or both witnesses could prove that in 2009 Jane Doe Two was

19, not 16 years, as Jane Doe Two testified, and was not 13 or 14 in 2006 as alleged in the Second Superseding Indictment. The materiality of the Caabi affidavit is that this witness could establish Jane Doe Two's actual age, a material and necessary fact to convict Yusuf of sex trafficking a minor.

For these reasons, the Court concludes that Defendant's Yusuf's motion for a new trial be granted and also that a new trial be granted for Defendants Idris Fahra and Kayachith.

### E. Defendant Kayachith's Motion for a New Trial on Evidentiary Issues

Of the pending motions, Defendant Kayachith's motion for a new trial includes claims that are not common with the other Defendants and must be addressed separately. In sum, Kayachith contends that: (1) that if a single conspiracy is proven, the Government's proof and argument about other co-defendants prejudiced Kayachith whose involvement was limited to April 2009; (2) that the jury instructions on venue were erroneous because all of the events of sex trafficking occurred in Minnesota; (3) that the Government was impermissibly allowed to introduce evidence of bad acts in its rebuttal examination of Hughes that was highly prejudicial to Kayachith; (4) the Government impermissibly expanded the definition of commercial sex trafficking in Section 1591(a) by introducing evidence of Jane Doe Two's consensual sexual acts with several of the Defendants; and (5) that the jury instruction on recklessness lessened the standard of criminal liability.

The Government responds, in essence: (1) that Kayachith drove Jane Doe Two and other Defendants to alleys in Minnesota to sell her for sex evincing his joining the conspiracy; (2) that Jane Doe Two testified that the Nashville trip was for commercial sex purposes, thus establishing this District as an appropriate venue for the part of the conspiracy; (3) that given the jury

instruction and verdict on a single conspiracy and the Government's proof about Kayachith was not prejudiced by proof about his co-Defendants' acts; (4) that the testimony of other bad acts by Hughes was based upon the Government's theory of an exchange of value, namely offering Hughes sex with Jane Doe Two in exchange for the use of his vehicle; (5) that evidence of Jane Doe Two's other sexual acts with other Defendants and other individuals was evidence of the Defendants' control over Jane Doe Two; and (6) that the jury instruction on recklessness conformed to the proof and the 2008 amendment to Section 1591(a).

In his reply, Kayachith concedes that his motion for a new trial does not challenge the sufficiency of the Government's proof, but cites his unresolved motion for acquittal. After a ruling on that motion, Kayachith argues that he can file a second motion for a new trial and also cites his motion for acquittal as raising the sufficiency of the evidence claim. Kayachith also cites the interest of justice standard as applying to any claim that is not in his motion for a new trial.

As to the prejudicial spillover effect claim from the Government's proof of other co-Defendants' bad acts, this claim is interrelated to the multiple conspiracy claim addressed by the Court earlier and this claim is denied as moot. For his venue jury instruction claim, the proof was presented, and the jury found that the purpose of the Nashville trip was for sex trafficking of Jane Doe Two so as to render the venue instruction appropriate. United States v. Zidell, 323 F.3d 412, 422 (6th Cir. 2003). For the Hughes' questioning on redirect by Government counsel about his allowing some of the Defendants to use his vehicle, this evidence was allowed on the basis of the Government's exchange of value theory, but Kayachith correctly argues that there was not any proof that gang members considered sex with Jane Doe Two to be of value and the jury acquitted all Defendants of the sex venture conspiracy count. Hughes's statement that the

Defendants did not exploit Jane Doe Two for prostitution and were not traveling to Nashville for that purpose eliminates any prejudice to Kayachith from this limited bad act evidence. See United States v. Hardy, 228 F.3d 745, 750-51 (6th Cir. 2000). For the proof of Jane Doe Two's voluntary acts, that evidence was on the Government's theory of control. The Defendants elicited testimony of Jane Doe Two's promiscuity and solicitation of sexual encounters for her personal pleasures. The Court concludes that this proof did not expand the scope of the commercial sex requirement of Section 1591(a). The Court's ruling does not preclude any state charges for these sexual assaults and rape.

For these reasons, the Court concludes that the Defendants' motions based upon proof of multiple conspiracies and the Government's violations of the Court's discovery Orders should be granted, but should otherwise be denied.

An appropriate Order is filed herewith.

**ENTERED** this the _19th_ of December, 2012.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court