# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

UNITED STATES OF AMERICA, )
)
    Plaintiff, )
)
v. )    No. 3:10-cr-00260
)    Chief Judge Haynes
ABDULLAH SADE AFYARE, )
et al, )
)
    Defendants. )

## MEMORANDUM

Before the Court are the following motions in limine filed by the United States that, in

essence, challenge the Court's rulings at the prior trial in this action:

> (1) Government's motion in limine on whether the Government's proof establishes
> multiple conspiracies under 18 U.S.C.§ 1591 (Docket Entry No. 3034);

> (2) Government's motion in limine on whether proof of nonsexual crimes can be
> introduced to prove a "venture" under 18 U.S.C.§ 1591(a)(2) (Docket Entry No.
> 3035);

> (3) Government's motion in limine on whether 18 U.S.C.§ 1591 is limited to sex
> trafficking of children under the age of 18 (Docket Entry No. 3036);

> (4) Government's motion in limine on whether sex is a "thing of value" for a
> conviction under 18 U.S.C.§ 1591 (Docket Entry No. 3037);

> (5) Government's motion in limine on whether the testimony of Khalid Noor, Farhan Daud
> and Dahir Daud is admissible (Docket Entry No. 3038);

> (6) Government's motion in limine on whether the Government's proof from certain
> witnesses constituted expert testimony (Docket Entry No. 3039);

> (7) Government's motion in limine on whether that expert proof is admissible on
> rebuttal (Docket Entry No. 3040); and

(8) Government's motion in limine on whether the Government must prove an overt act for a conviction under 18 U.S.C.§ 1591(a)(2) (Docket Entry No. 3041).

To control costs and to meet the Government's request for an appeal in sufficient time in advance of the October 2013 trial, the Court designated certain defense counsel to file a defense response to each Government motion and allowed any other defense counsel to file a supplemental memorandum on any of these motions. The Court also set a deadline for the Government's replies that were filed on May 2, 2013. (Docket Entry Nos. 3133, 3134, 3135, 3137, 3139, 3140 and 3154). The Defendant Farah filed a response on May 6, 2013. (Docket Entry No. 3145). On May 13, 2013, the Government subsequently filed a response to Defendant Farah's May 6th response. (Docket Entry No. 3154).

As a threshold issue, the Government's motions seek advance rulings for the October 22, 2013 trial on whether the Court will reaffirm its rulings at the first trial based upon the law of the case doctrine. The Government also cites decisions recognizing the Government's right to appeal evidentiary rulings.[1] Under the law of the case doctrine, the Court can revisit its earlier rulings and alter any ruling upon a showing of a manifest injustice or clear error of law or changed factual

---

[1] United States v. Presser, 844 F.2d 1275, 1279 (6th Cir.1988)(United States may appeal order excluding evidence); United States v. DeCologero, 364 F.3d, 2 1-22 (1st Cir. 2004)(District Court's reservation of whether RICO Act will be admissible at trial constitutes appealable Order as it had the practical effect of excluding evidence; United States v. Drogoul, 1 F.3d 1546, 1551 (11th Cir. 1993)(Appeal by United States of District Court (denying motion to depose material witness based upon concerns regarding procedures to be employed in taking of depositions was proper as the order had the practical effect of excluding evidence; United States v. Schwartz, 857 F.2d 655, 657 (9th Cir. 1988)(United States may appeal order of the District Court which has the practical effect of excluding evidence); Helstoski v. United States, 576 F.2d 511, 521 (3rd Cir. 1978)(United States may appeal where practical effect of District Court's Order is to prevent the Government from introducing evidence); United States v. Flores, 538 F.2d 939, 943 (2nd Cir. 1976)(United States appeal of District Court's Order construing extradition and limiting proof United States could present at trial).

circumstances. <u>Arizona v. California</u>, 460 U.S. 605, 618 (1983). Yet, in its motions, the Government does not present any analysis of the Court's earlier rulings for legal or factual error nor does the Government cite any legal authority nor advance a theory under which the cited evidence could be admissible. In its replies, the Government cites authorities to which the Order did not provide for a response from the Defendants and any amendment would cause further delays

The Court also agrees with the Defendants that "[a] party may use a motion in limine to exclude inadmissible or prejudicial evidence before it is actually introduced at trial" <u>Luce v. United States</u>, 469 U.S. 38, 40 n.2 (1984). Yet, in its motions, the Government "requests the court to revisit the issues" raised at trial. (Docket Entry No. 3130 at 2). The Government motions are actually motions to reconsider that under Local Rule 7.01 should have been filed fourteen (14) days after the ruling to afford an opportunity to cure before the trial ended. Motions to reconsider are limited to "manifest errors of law or fact." <u>Calderon v. Reno</u>, 56 F.Supp.2d 997, 998 (N.D. Ill. 1999) (citations omitted). As noted in the Court's earlier memorandum, these motions rest on numerous contingencies at the next trial. (Docket Entry No. 3102, Memorandum at 3-4). With the prospect of more than ten (10) new Defendants for the second trial the evidence will likely be different or be presented differently that could also alter the Court's earlier rulings. <u>Id.</u>

**A. Government's motion <u>in limine</u> on whether the Government's proof establishes multiple conspiracies under 18 U.S.C.§ 1591[2] (Docket Entry No. 3034)**

---

[2] With some minor modifications, this section incorporates the Court's earlier ruling on this same issue that is now the subject of the Government's pending appeal. Of course, for the pending motion in limine, the Government does not cite any new evidence and the Court must assume that at the second trial, the evidence on the sex trafficking conspiracies will be the same. As stated in its earlier Memorandum, the Court is concerned about jurisdictional issues in ruling on the same issue where an appeal is pending. As expressed in its Memorandum for the Order setting the briefing schedule, the Court is also concerned of the benefit of such a ruling on an undefined factual record for new Defendants. Nonetheless, to avoid the assertion about the Court

At the prior trial, a common defense challenge was that the Government's theory was a single conspiracy, but the Government's proof actually established multiple conspiracies and created material variances from the Second Superceding Indictment. In its post-trial ruling, the Court set aside the convictions of three Defendants in part, for this reason. (Docket Entry No. 2968, Memorandum at 22-39). Defendants argued that the Government's proof established five distinct conspiracies: (1) the Jane Doe Five conspiracy from 2000 to 2006 involving Defendants Adan and Ibrahim; (2) the 2006-2009 conspiracy involving Jane Doe Five and Defendant Adan, Ibrahim and Fadumo Farah; (3) the 2006 to 2007 Jane Doe Two conspiracy involving Defendants Abdullah Hashi, Mohamed Ahmed Amalle, Fuad Nur and Idris Ibrahim Fahra; (3) the May 2007 Rochester trip involving Defendants Fatah Hashi, Hassan Ahmed Dahir and Yassin Abdirahman Yusuf; and (5) the April 2009 Jane Doe Two conspiracy involving Defendants Abdullahi Sade Afyare, Abdikarim Osman Ali, Haji Salad, Yassin Abdirahman Yussuf, Abdirahman Yusuf, Ahmad Abdulnassir Ahmad and Kayachith.

Defendants also cited large time gaps in the Government's proof of any sexual activities involving Jane Does Two and Five. For Adan's 1999-2000 cited recruitment of Jane Doe Five, Defendant Yusuf was not charged with any acts in the conspiracy until 2007 with Jane Doe Two. The activities involving Jane Doe Two were from November 2006 through May 2007 and later from April 24, 2009 through April 28, 2009. Defendants noted that after July 2007, there was not any evidence of Jane Doe Two's sex activity with these Defendants. Jane Doe Two admitted that she did not engage in any prostitution activities during this two year time period. Jane Doe Two testified

---

delaying a ruling and prejudicing the Government's appeal rights, the Court addresses all pending motions.

that she did not discuss prostitution with Defendant Haji Osman Salad, her boyfriend, prior to April 25, 2009. There was Internet communication with Jane Doe Two by Defendant Haji Salad who is Jane Doe Two's boyfriend. Defendant Kayachith is not mentioned as being with Jane Doe Two until April 24, 2009.

In its response to Yusuf' motion for acquittal, the Government describes the factual predicates for the single conspiracy:

> Defendant[s] Mohamed Sharif Omar and Liban Sharif Omar are the common threads running through the conspiracy. Mohamed Omar Sharif trafficked [Jane Doe Five]. Mohamed Sharif visited 964 Village Hills Drive looking for girls. Mohammed and Liban plotted to obstruct [Jane Doe Two's] parents from coming to Nashville. Liban rented a room to further the sex trafficking of [Jane Doe Two]. Yusuf was one of the Defendants who brought [Jane Doe Two] from Minnesota to Nashville for the purpose of sex trafficking. Defendant [Yusuf] has made no argument or submitted any proof that he has ever withdrawn from a conspiracy. Thus, there is enough evidence to support a finding that a single conspiracy existed and Defendant's claim should be denied.

(Docket Entry No. 2577 at 9). In opposition to Defendant Kayachith's motion for new trial on this multiple-conspiracies contention, (Docket Entry No. 2854), the Government cited to its earlier memoranda on the defense severance motions. Id. at 1. After a review of the latter submissions, the detailed response cites the Defendants' participation in a "venture" as defined in 18 U.S.C. § 15(e)(5) and referenced in Section 1591(a)(2). At the trial, the jury acquitted all Defendants on the venture theory in Count Two.

As to this multiple conspiracies contention, the Second Superseding Indictment charged two counts of conspiracy that were tried. The core of the two conspiracy[3] counts involving thirty

---

[3]Although listed on the cover page of the Second Superceding Indictment, the language of that indictment for conspiracies to engage in sex trafficking does not charge a conspiracy under 18 U.S.C.§1594(c).

defendants, was in sum, that the Defendants:

## Count One

did combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury, to recruit, entice, harbor, transport, provide, obtain, and maintain by any means a person knowing and in reckless disregard of the fact that the person had not attained the age of 14 years and had not attained the age of 18 years and would be caused to engage in a commercial sex act, and knowing and in reckless disregard of the fact that the person had not attained the age of 18 years and that means of force or fraud or a combination of such means would be used to cause a person to engage in a commercial sex act in violation of Title 18, United States Code, Section 1591(a)(1).

## Count Two

did combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury, to benefit financially and by receiving anything of value, from participation in a venture which engaged in an act of recruiting, enticing, harboring, transporting, providing, obtaining, and maintaining by any means a person knowing and in reckless disregard of the fact that the person had not attained the age of 14 years and had not attained the age of 18 years would be caused to engage in a commercial sex act and knowing and in reckless disregard of the fact that the person had attained the age of 18 years and that means of force or fraud or a combination of such means would be used to cause a person to engage in a commercial sex act in violation of Title 18, United States Code, Section 1591(a)(2).

(Docket Entry No. 591, Second Superseding Indictment at 7-8, 24). The second conspiracy count charged a conspiracy to participate in a "venture" to benefit from the sexual trafficking of minor females. As to Count Two, according to the Government's lead counsel: "It's the same acts that make up the conspiracies." (Docket Entry No. 2645, Transcript at p. 2623). As stated earlier, the jury acquitted these Defendants on Count Two.

Count One listed as victims minors Jane Doe One through Four, (Docket Entry No. 591, Second Superseding Indictment at 8-21), but of these victims, only Jane Doe Two testified at trial. Jane Doe Five testified that Defendant Abdifatah Jama Adan enticed her to prostitution with

promises of a better life in 1999-2000 in Minnesota. According to Jane Doe Five, in 2000 Defendant Dahir Ibrahim traveled to Minnesota from Nashville looking for girls to take back to Nashville and asked Jane Doe Five if she wanted to travel to Nashville for prostitution. Jane Doe Five decided to move to Maryland and later moved to Nashville to be with her mother. The Government did not prove that Ibrahim ever actually secured and transported any minor girls from Minneapolis to Nashville nor any proof of the ages of any girls. Jane Doe Five opined as to their ages of females at Defendant Fadumo Farah's apartment in Nashville where Jane Doe Five reconnected with Adan and Defendant Fadumo Farah. Jane Doe Five testified that Fadumo Farah operated a prostitution ring at her apartment, but the jury acquitted Defendant Fadumo Farah of any such conspiracy. At trial, there was not any proof tying Defendant Kayachith or Yusuf or Fahra to Jane Doe Five or Adan or Fadumo Farah.

Jane Doe Two testified that on April 25, 2009 she overheard Haji Salad, Abdullahi Afyare, and Liban Sharif Omar planning a trip to Nashville. In response to government's counsel's questioning about this conversation, Jane Doe Two testified that Andrew Kayachith and Abdikarim Ali were present, but did not refer to Kayachith participating in this conversation. The jury acquitted Ali. Yet, Jane Doe Two then testified that throughout the day she was driven around in alleys and Haji Salad, Abdullahi Sade Afyare, and Abdikarim Osman Ali were driving looking for people and calling people to see if they wanted to have sex with Jane Doe Two in exchange for money. Jane Doe Two testified "AK", Kayachith, was driving the vehicle. Neither Mohamed nor Liban Omar are tied to this latter activity. Jane Doe Two then testified that she engaged in sex with ten people in which cash money was exchanged. As stated earlier, this testimony differed from Jane Doe Two's prior statements about April 25th that did not contain any reference to sex trafficking on April 25th.

7

In any event, Jane Doe Two described Defendant Haji Salad as the person who collected the money. For the remainder of April 25, 2009, Jane Doe Two is with Yassin Abdirahman Yusuf. On the morning of April 26, 2009, Jane Doe Two had sex with Biggie without any exchange of money. Kayachith was at the garage where the sex act occurred. On the morning of April 26th Jane Doe Two testified that Abdullahi Afyare contacted a person named "AZ" as a potential purchaser of sex acts, but that sexual act did not occur.

Jane Doe Two testified that reason she engaged in sex the weekend of April 24, 2009 was because Haji Salad, her boyfriend told her to have sex with them and he was already mad at her so she was trying to please him. The undisputed fact is that Jane Doe Two's sex with the gang members was free. From April 27 through April 28, 2009, Andrew Kayachith is one of five persons who traveled from Minnesota to Nashville, Tennessee with Jane Doe Two.

As another tie, the Government cited a jail telephone transcript between Defendants Haji and Liban Omar about preventing Jane Doe Two's family coming to Nashville. Although the transcripts reflect Haji telling Liban Omar to get his brother to talk to Jane Doe Two's family there is not any proof that anyone did so. Further, Mohamed Sharif Omar does not affirmatively state that someone should prevent Jane Doe Two's parents from coming to Nashville. There is a point at which Defendant Salad and Defendant Muhiyadin Hussein Hassan discuss the need for Mohamed Sharif Omar to speak with the parents because Mohamed Omar "is really good with the family." (Docket Entry No. 2636, at p. 2131). Yet, this dialogue amounts to third-party discussion. The jail transcripts also reflect Mohamed Omar castigating Defendant Salad for putting himself in a position to be arrested with Jane Doe Two in Nashville, but the language does not connote conspiratorial behavior, only rebuke.

**Mohamed:** What did I tell you that day? Didn't I tell you to leave, stupid? Do you remember?

**Salad:** Yeah, man. You are the one that put us there.

**Mojo:** Fuck you, man. Didn't I tell you, let's go, let's get out of here. Didn't I tell you that?

(Docket Entry No. 2636, at 2121).

The jail transcripts do reveal Mohamed Omar's brothers Defendants, Liban Omar and Abdifatah Sharif Omar ("British"), affirmatively expressing intentions of talking to Jane Doe Two's parents, but the same is not true of Mohamed Omar.

**Liban:** We will talk to her family. Her family will be talked to.

**To British:** You are going to talk to her family; right?

**British:** Yes, I am calling them right now.

**Liban:** We will talk to the girl's family. There you go.

(Docket Entry No. 2636, at 2101).

The jail transcripts illustrate Liban Omar's willingness to block Jane Doe Two's parents from coming to Nashville, but Liban Omar does not provide the Government with a conspiratorial link to Jane Doe Five. Mohamed Omar is the person who allegedly approached Jane Doe Five about engaging in commercial sex, but the jury rejected her testimony. The Government also relies on Liban and Mohamed Omar's familial relationship in asserting that Liban and Mohamed worked together to keep Jane Doe Two's family from coming to Nashville. The government asserts that when Liban Omar says "we will talk to the girl's family" in the above conversation, he means that all of the brothers will do so. The Government asserts that the jail telephone transcripts reveal that

Liban Omar would get both of his brothers to talk to Jane Doe Two's family.

> Liban Omar, through these jail tapes, is discussing, we need to make sure the family – and I will get my brothers, British . . . and [Mohamed], and we'll talk to the family. We know members, and if we can keep them from coming to court, things will get dismissed. That is the connection. That is flows through these people. They are all associated, not only by inference, but in fact. And that is the association. The venture.

(Docket Entry No. 2636, at 2196). To conclude that the "we" Liban is speaking of above includes Mohamed Omar is speculative as to whom is included in "we." The Government's contention that Mohamed Omar is a common thread in a overarching single conspiracy relies on the premise that "Mohamed and Liban plotted to obstruct Jane Doe Two's parents from coming to Nashville," but the Government did not prove how or when they "plotted." (Docket Entry No. 2577, at 9).

The Government also points to a jail phone conversation exchange between Mohamed and Liban Omar where Mohamed tells Liban that the police know "everything," to buttress its argument for Mohamed Omar's centrality in the conspiracy. The following two excerpts provide two pertinent exchanges:

**Mohamed**: They even know that you are behind everything.

**Liban**: Me?

**Mohamed**: Yes.

**Liban**: Who told you that?

**Mohamed**: You just keep saying who told you? Who told you? It was on TV.

**Liban**: You are lying.

**Mohamed**: I swear to God, I'm not lying.

(Docket Entry No. 2636, at 2247).

**Mohamed**: I'm not lying to you. Your friend's situation right now, they are kind of digging everything out. I will see what happens. They even said you were the leader.

**Liban**: They said my name?

**Mohamed**: Yes, that you are behind the wheels, you know?

(Docket Entry No. 2636, at 2252). According to the Government, these exchanges illustrate that Mohamed Omar is a fully integrated member of the sex trafficking of Jane Doe Two to Nashville. The excerpts, however, fail to prove that Mohamed Omar played any role in Jane Doe Two's coming to Nashville (i.e., the "situation"), nor to describe the "common thread" of the conspiracy.

At the time of these telephone calls, the outstanding charges against the Defendants were contributing to the delinquency of a minor, Jane Doe Two, not prostitution. Jane Doe Five did not mention any of these Defendants as having any ties to the 964 apartment in Nashboro Village. The only evidence that the girls at the Nashboro Village residence were underage and were sexually trafficked was from Jane Doe Five. By its verdict on Fadumo Farah, the jury did not credit Jane Doe Five that would include Jane Doe Five's testimony about Adan and Mohamed Sharif Omar. As to Liban Sharif Omar renting a room for Jane Doe Two on April 24th, there is not any evidence of sexual trafficking of Jane Doe Two on that occasion.

The longstanding Sixth Circuit rule is that while a single conspiracy does not become multiple conspiracies simply because each member of the conspiracy does not know every other member, **it is necessary to show that each alleged member "agreed to participate in what he knew to be a collective venture directed toward a common goal."** United States v. Warner, 690 F.2d 545, 549 (6th Cir.1982) (emphasis added). In addition, the Sixth Circuit has "found single

11

conspiracies even where the connections between the co-conspirators were minimal." United States v. Swafford, 512 F.3d 833, 842-43 (6th Cir. 2008) (citing United States v. Kelley, 849 F.2d 999, 1003 (6th Cir.1988)). Moreover, "'[w]hether single or multiple conspiracies have been established is usually a question of fact to be resolved by the jury . . . and [is] to be considered on appeal in a light most favorable to the government.'" United States v. Warman, 578 F.3d 320, 342 (6th Cir. 2009) (quoting United States v. Smith, 320 F.3d 647, 652 (6th Cir. 2003)). Yet, under Sixth Circuit precedent, if the record establishes multiple conspiracies, then reversal of a conviction is required. Swafford, 512 F.3d at 842. A district court has considered motions for acquittal under Rule 29 on the issue of whether the Government's evidence proved multiple or single conspiracies. United States v. Mayweather, Nos. 94-1414, 94-1530, 94-1482, 94-1705, 94-1483, 57 F.3d 1071, 1995 WL 364220, at *3 (6th Cir. June 16, 1995).

Under the applicable law, the prejudices or evils to be avoided with multiple conspiracies are, as the Supreme Court warned, charging large numbers of defendants in a criminal conspiracy charge such that "as [the conspiracy] is broadened to include more and more, in varying degrees of attachment to the confederation, the possibility for miscarriage of justice to particular individuals becomes greater and greater" Kotteakos v. United States, 328 U.S. 750, 776 (1946). The Supreme Court also warned of piling inference upon inference. Swafford, 512 F.3d at 843 (citing Direct Sales Co. v. United States, 319 U.S. 703, 711 (1943) (**"[C]harges of conspiracy are not to be made out by piling inference upon inference, thus fashioning . . . a dragnet to draw in all substantive crimes."**)). Thus, the purposes of the prohibition of proof of multiple conspiracies are "'to prevent the prosecution from convicting the defendant of a different offense, not a lesser variation of the charged offense'" and impose "guilt to an individual defendant involved in one conspiracy from

evidence incriminating defendants in a conspiracy in which the particular defendant was not

involved." Warman, 578 F.3d at 342 (quoting United v States v. Hughes, 505 F.3d 578, 587 (6th

Cir. 2007) and United States v. Levine, 569 F.2d 1175, 1177 (1st Cir. 1978)).

If the Government's proof established multiple conspiracies instead of the charged single

conspiracy, then the Defendants' convictions must be set aside. In Swafford, the Government

indicted the defendant in a single conspiracy to manufacture methamphetamine. 512 F.3d at 838. The

Sixth Circuit reversed the defendant's conviction for conspiracy because the Court determined that

the proof showed multiple conspiracies, not a single conspiracy. Id. at 841. On the issue of whether

the Government's proof established a single conspiracy or multiple conspiracies, the Sixth Circuit

stated:

> Even viewing the evidence in the light most favorable to the government, the
> government failed to prove a common goal as between the customers, a necessary
> element of a single conspiracy charge. That is, the government's metaphorical
> argument that this was a "wheel conspiracy" (or "hub-and-spoke" conspiracy)-
> wherein the defendant served as the hub connected to each of the customers via a
> spoke ( *i.e.* provision of iodine)-fails because no common goal or enterprise existed.
> As the Supreme Court described in Kotteakos, **"without the rim of the wheel to**
> **enclose the spokes," a single, wheel conspiracy cannot exist but instead is a**
> **series of multiple conspiracies between the common defendant and each of the**
> **other defendants. Kotteakos, 328 U.S. at 755, 66 S.Ct. 1239. "A rimless wheel**
> **conspiracy is one in which various defendants enter into separate agreements**
> **with a common defendant, but where the defendants have no connection with**
> **one another, other than the common defendant's involvement in each**
> **transaction."** Dickson v. Microsoft Corp., 309 F.3d 193, 203 (4th Cir.2002); see also
> United States v. Chandler, 388 F.3d 796, 808 (11th Cir.2004) (**"for a wheel**
> **conspiracy to exist, those people who form the wheel's spokes must have been**
> ***aware* and must do something in furtherance of some single, illicit enterprise")**
> (emphasis in original) (citation omitted). Here, we have exactly this type of rimless
> conspiracy. **The government failed to prove that the methamphetamine cooks**
> **were acting in furtherance of a common goal or that there was any significant**
> **interdependence among them. See Chandler, 388 F.3d at 811. Consequently,**
> **there is a variance between the crime charged (a single conspiracy) and the**
> **crime proved (multiple conspiracies).**

Finding a variance does not mandate a reversal; in order for the variance to constitute reversible error, a defendant must at the very least show that this variance prejudiced him. See Caver, 470 F.3d at 237 (a variance is not *per se* prejudicial). "Where the evidence demonstrates *only* multiple conspiracies, a defendant is prejudiced if the error of trying multiple conspiracies under a single indictment substantially influenced the outcome of the trial." *Id.* (citing Kotteakos, 328 U.S. at 765 (emphasis in original).

This case does not present the two most problematic forms of prejudice: (1) where the defendant is unable to present his case and is "taken by surprise by the evidence offered at trial," United States v. Budd, 496 F.3d 517, 527 (6th Cir.2007) (quoting Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)), or (2) where the defendant is "convicted for substantive offenses committed by another." United States v. Friesel, 224 F.3d 107, 115 (2d Cir.2000). Swafford had notice of the crimes charged against him and was not convicted for substantive crimes committed by another. But this observation does not end the enquiry, for as the Second Circuit describes, prejudice may also exist where " 'spillover' [occurs] because of a large number of improperly joined defendants." Id. Indeed, **the possibility of prejudice resulting from a variance *increases with the number of defendants* tried and the number of conspiracies proven."** United States v. Bertolotti, 529 F.2d 149, 156 (2d Cir.1975) (emphasis added) (citing Blumenthal v. United States, 332 U.S. 539, 559, 68 S.Ct. 248, 92 L.Ed. 154 (1947)). The sale of iodine to many unrelated customers is no different from the sale of birdseed to many birdwatchers or the sale of other products at retail to many users who are unconnected to each other. **Where there is no connection between users of the same product but the factfinder mistakenly believes there is a union of interest and criminal intent and an agreement to coordinate activity, the harm to the public will appear to be greater and the participants more culpable. Here, the appearance of coordinated criminal activity appears more culpable than individual sales, implicating the Supreme Court's long-standing admonition that "charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning ... a dragnet to draw in all substantive crimes."** Direct Sales Co. v. United States, 319 U.S. 703, 711, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943).

Id. at 842-43 (footnotes omitted).

Here, the Government contends that this sex trafficking conspiracy is a "chain conspiracy" that is usually associated with drug conspiracies. In instances of a "chain conspiracy,"

"[f]or conviction, [the defendant] must have been shown to have agreed to participate in what he knew to be a joint venture to achieve a common goal. However, actual agreement need not be proved. Drug distribution conspiracies

**are often 'chain' conspiracies such that agreement can be inferred from the interdependence of the enterprise.** One can assume that participants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell."

Id. (quoting United States v. Bourjaily, 781 F.2d 539, 544 (6th Cir.1986)). **Mere association with conspirators is insufficient to demonstrate participation in a conspiracy.** Gibbs, 182 F.3d at 422. **Likewise, the government generally cannot establish a defendant's agreement to participate in the conspiracy based solely on a buyer-seller relationship.** United States v. Anderson, 89 F.3d 1306, 1310 (6th Cir.1996). "However, **additional evidence beyond the mere purchase or sale of drugs, such as evidence of repeat purchases or some enduring arrangement that implies knowledge of the scope of the conspiracy may support a conspiracy conviction."** United States v. Layne, 192 F.3d 556, 568 (6th Cir.1999), cert. denied, 120 S.Ct. 1443 (2000).

United States v. Brown, No. 97-1618, 221 F.3d 1336, 2000 WL 876382 at *3-4 (6th Cir. June 10, 2000).

As the Sixth Circuit later observed, the chain conspiracy involves proof of vertical structure with proof of significant interdependence among participants and large quantities of drugs.

Like many legitimate industries, **the distribution of drugs from suppliers, through middlemen, to the end consumer often assumes a vertical pattern of distribution, where each successive distributor sells a lower volume to any particular customer. Where drugs are concerned, this can form a "chain" conspiracy where an agreement to supply drugs to a given area can be inferred from the interdependence of the enterprise.** See id. ("'One can assume that the participants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell.'" (quoting United States v. Spearman, 186 F.3d 743, 746 (6th Cir.1999))). That said, **the agreement to enter into a transaction, which must by definition exist between a willing buyer and a willing seller, is not equivalent to the agreement needed to support a conviction for conspiracy.** Gibbs, 182 F.3d at 421. **Instead, a conviction must be based on evidence from which a rational trier of fact could find that the defendant had knowledge of the conspiracy itself, and purposefully joined the conspiracy.** See **United States v. Grunsfeld, 558 F.2d 1231, 1235 (6th Cir.1977). This can be inferred through circumstantial evidence,** Henley, 360 **F.3d at 513, including evidence of repeated purchases, or evidence of a large quantity of drugs.** United States v. Martinez, 430 F.3d 317, 333 (6th Cir.2005), cert. denied, 547 U.S. 1034, 126 S.Ct. 1603, 164 L.Ed.2d 324 (2006) (citing United States

15

v. Brown, 332 F.3d 363, 373 (6th Cir.2003)).

United States v. Caver, 470 F.3d 220, 233 (6th Cir. 2006) (emphasis added).

As these principles are applied here, the Government's proof does not establish any characteristics of a vertical distribution scheme. There is not evidence of an "enduring arrangement" nor the "significant interdependence" of the members of the alleged conspiracy. The Government's proof does not show interaction of these Defendants with Adan or Mohamed or Liban Omar or Fadumo Farah to achieve an overall goal. The jury's verdict acquitting Fadumo Farah of sex trafficking at the Nashboro Village residence bars any concerted activity with these Defendants. The acquittals of Defendants: Ahmad Abnulnasir Ahmed, Musse Ahmed Ali, Fadumo Mohamed Farah, Dahir Nor Ibrahim, and Mohamed Ahmed Amalle on Counts One and Two; and Defendants Fatah Haji Hashi and Mohamed Ahmed Amalle on Counts One, Two, Twelve and Thirteen necessarily means there was not any interdependence of those Defendants and these Defendants who were convicted. Thus, aside from the Second Superseding Indictment charging two separate conspiracies, the jury's verdict of acquittal on the second count, based on the same facts as Count One, necessitates the conclusion that the Government's proof established multiple conspiracies.

Moreover, these isolated acts of these Defendants and the acquitted Defendants do not evince the large scale activities associated with a chain conspiracy. Most of the actual sex acts with Jane Doe Two were of a non commercial nature. The specifics of disputed commercial sex acts are the 2006 incident at Farah's apartment and the April 25 alley sales of Jane Doe Two for money and the exchanges of liquor and marijuana on one occasion during that time period. The Government's proof of the purpose of the Nashville trip as for sexual exploitation of Jane Doe Two is contradicted by Jane Doe Two's initial statements to Metro officers and Weyker about the purpose of the trip.

Jane Doe's testimony also conflicts with the testimony of Hughes, a government witness, who testified under a grant of immunity that the Defendants were not engaged in prostitution or he would have known about it. As Caver explains, evidence of a willing agreement to engage in isolated conduct or transaction is not evidence of a larger agreement to join a large enterprise of sex trafficking, as in a drug distribution conspiracy, with operators at different levels. 470 F.3d at 233. Moreover, the jury acquitted all of the Defendants on Count Two that was the "venture" concept of the Defendants' alleged concerted conduct.

Here, the Government's proof of a conspiracy is more akin to the "wheel conspiracy" or "hub-and spoke conspiracy" where a defendant or defendants at the hub are connected to others or spokes of the wheel. United States v. Galan, 436 Fed. Appx. 467, 469 (6th Cir. 2001) (citing Swafford, 512 F.3d at 842). From the Court's analysis of the Government's proof, there is not any evidence of discernible "hub", but rather the Government's proof is of different and unconnected groups of persons acting with different females at different times in different cities and states. To be sure, there are references to Defendants as members or associates of the Somolia Outlaws or Somalia Mafia mostly through acts of displaying gang signs. Yet, this action presents the very problems that the Supreme Court warned about in charging large numbers of defendants in a criminal conspiracy charge namely that " as [the conspiracy] is broadened to include more and more, in varying degrees of attachment to the confederation, the possibilities for miscarriage of justice to particular individuals becomes greater and greater." Kotteakos v. United States, 328 U.S. 750, 776 (1946). The Supreme Court also warned of piling inference upon inference. Swafford, 512 F.3d at 843. The Court notes that the jury acquitted all the Defendants on Count Two of any conspiracy/venture to exploit minor females for commercial sex trafficking that involves the same

facts as in Count one. The jury's verdict acquitting six of the Defendants and acquitting all Defendants of the Count Two conspiracy, as well as the Government's charge of two conspiracies, actually support the Defendants' multiple conspiracies theory.

The Government further asserts that even if the Defendants proved "that a variance resulted in guilt transference, typically any danger of prejudice can be cured with a cautionary instruction to the jury that if it finds multiple conspiracies, it cannot use evidence relating to one conspiracy in determining another conspiracy. <u>United States v. Hughes</u>, 505 F.3d 578, 587 (6th Cir. 2007) (citing <u>United States v. Blackwell</u>, 459 F.3d 739, 762 (6th Cir. 2006)).

The Court's multiple-conspiracies jury instructions in this action included cautionary language, while avoiding "confusing, misleading, and prejudicial" statements of law by clearly stating that the jury must find that Defendant participated in the conspiracy alleged in the Second Superseding Indictment to convict Defendant of conspiracy. <u>Blackwell</u>, 459 F.3d 739, 762. In pertinent part, the Court's multiple-conspiracies instruction read:

> To convict any one of the defendants of the conspiracy charge, the government must convince you beyond a reasonable doubt that the defendant under consideration was a member of the conspiracy charged in the Second Superseding Indictment. If the government fails to prove this, then you must find that defendant not guilty of the conspiracy charge, **even if you find that he or she was a member of some other conspiracy. Proof that a defendant was a member of some other conspiracy is not enough to convict.** Charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning a dragnet to draw in all substantive crimes.

(Docket Entry No. 2659, Trial Transcript of Final Jury Instructions, "Multiple Conspiracies Claims," at 181-182) (emphasis added).

Yet, the lynchpin of this issue does not, as the Government contends, rest upon proper jury instructions alone. While the Court's instructions may have dutifully admonished the jury about

using evidence of a conspiracy proven by the Government that was not included in the Second Superseding Indictment to convict the Defendants, this does not end the Court's inquiry into the curative nature of the jury instructions. The Government here fails to address the Sixth Circuit's contention in <u>Blackwell</u> that "the more evidence presented at trial that is unrelated to the defendant's conduct, or a conspiracy in which the defendant took part, the less likely instructions are to cure the danger of guilt transference." <u>Blackwell</u>, 459 F.3d at 762.

In <u>Blackwell</u>, the Sixth Circuit upheld the defendant's insider trading conspiracy conviction because the Court found the defendant had not been prejudiced at trial. The Court considered the number of conspiracies the evidence establishes, the number of non-conspiratorial co-defendants tried with defendant, and the size of the conspiracy alleged in the indictment in determining whether a variance was prejudicial. <u>See id.</u> (citing <u>Kotteakos</u>, 328 U.S. at 766). Following <u>Blackwell</u>'s blueprint, the Court here concludes that the convicted Defendants were prejudiced by: (1) the Government's proof of five conspiracies; (2) that the Second Superseding Indictment charged thirty Defendants for conspiracies spaning almost ten years; and (3) the jury acquitted all the Defendants on Count Two, the Government's "venture" theory of the Defendants' alleged concerted conduct that relies on the same facts as Count One. Unlike <u>Blackwell</u>, where the conspiracy involved far fewer than thirty defendants, and a much more tightly linked group of defendants, the single conspiracy indictment in this action cannot be saved by carefully crafted jury instructions alone. <u>Id.</u> at 749.

As a conceptual matter, the Court finds it difficult to conceive a single conspiracy when the Second Superseding Indictment actually charges two distinct conspiracies. From the Court's review, there was not any proof that the thirty Defendants, including these Defendants were "acting in furtherance of a common goal or that there was any significant interdependence among them."

19

Swafford, 512 F.3d at 842. For these reasons, the Court concludes that under Swafford, the Defendants' motions for a dismissal on grounds of the Government's proof of multiple conspiracies rather than the single conspiracy in the Second Superseding Indictment should be granted. Assuming the identical proof at the first trial, the Court does not discern any basis to alter its prior ruling on multiple conspiracies.

### B. Government's motion in limine on whether evidence related to nonsexual crimes can be introduced to prove a "venture" under 18 U.S.C. § 1591(a)(2) (Docket Entry No. 3035)

The United States asserted at the first trial that proof of a "venture" for sex trafficking under 18 U.S.C. § 1519(a)(2) may include proof of non-sexual criminal acts where two or more of the Defendants were together, notwithstanding that the cited conduct was unrelated to or did not involve sex trafficking. The Government's specific proof was testimony of St Paul area police officers who stopped or arrested two or more of the Defendants for various crimes, burglary, traffic stop, property damage, attempted burglary, loitering and robbery.

The Court excluded such proof because those incidents "aren't tied in any way as acts that would help the sex trafficking venture succeed." (Docket Entry No. 2636, at 2188). Citing several Circuit decisions, including Sixth Circuit, the Court concluded that the definition of "venture" for Section 1591(a)(2)[4] limits the proof to acts involving sex trafficking.

---

[4] 18 U. S. C. 1591(a)(2) provides as follows: Whoever knowingly--
(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

THE COURT: Well, why don't we take the transcripts first, and before the officers testify again there is another motion. Does the government have any authority that proof for its theory on venture -- that proof that they were together on different dates on other matters proves a venture under the sex trafficking statute? Any authority on that?

MR. VINCENT: No.

THE COURT: Any analogous authority on that?

MR. VINCENT: When looking for -- in relation to that particular statute as to proving how you establish the venture, I couldn't -- I didn't find any cases associated with that.

THE COURT: I want you to look at <u>United States v. Moss</u>, 379 Fed. App. 651 (9th Cir. 2010), that discusses the sufficiency of the evidence that was filed on May 18, 2010, that discusses sufficiency of the evidence for a sex trafficking venture.

* * *

. . . [T]here are also other cases on the issue of what it takes to prove a criminal venture. It's <u>United States v. Longoria</u>, 569 F.2d 422 at Page 425 (5th Cir. 1978). But <u>Longoria</u>, it's a Fifth Circuit case, but I'm giving it to you because it has been cited approvingly by the Sixth Circuit in <u>United States v. Aarons</u>, 718 F.2d 188 at 191 (6th Cir. 1983). And cited more recently in <u>United States v. Coppin</u>, 1 Fed. App. 283 at 294. In essence, <u>Longoria</u> states that, quoting one of its prior decision: "**To be upheld, a conviction must be based upon evidence that the defendant was associated with a criminal venture, participated in it as something he wished to bring about and sought to make his actions to make it succeed. To prove the association, there must be evidence to establish the defendant shared in the criminal intent of the principal. To prove participation, there must be evidence to establish that the defendant engaged in some affirmative act, that is, there must be evidence the defendant committed an overt act designed to aid in the success of the venture. Proof of mere negative acquiescence will not suffice.**" And it has been cited on that point by the Sixth Circuit in the cases that I have cited to you. In particular, in the <u>Coppin</u> case, the Sixth Circuit said: "At most, the government has shown that the defendant helped drive Garcia to Cincinnati, but there is no evidence that the defendant knew that Garcia was traveling to Cincinnati to participate in a drug deal. In the absence of evidence showing that the defendant knew of the criminal venture, the government cannot prove that the defendant intended to make the criminal venture succeed. In this case, evidence is insufficient to support a conviction for aiding and abetting, and no rational trier of fact would have concluded that defendant knew of the criminal venture and acted in such

manner as to make the criminal venture succeed. And then cited <u>Longoria</u> in the reference to: Mere association is not, without more sufficient evidence for aiding and abetting, a criminal venture." Now, and, of course, the Moss case reviewed a conviction for sexual trafficking. And stated that: The evidence was sufficient to convict Moss of participating in a venture in violation of 18 U.S.C. Section 1591(a)(2). Brooks, who joined Moss to make money for something she wanted to do, helped recruit and manage prostitutes, including two under women, and handled the enterprise's finances in Moss's absence. Nothing in the statutes says that Brooks could not be a co-venturer, although in other respects she was a victim herself. Given that she was associated, in fact, with Moss for financial benefit from commercial sex on an ongoing basis, a rational juror could find beyond a reasonable doubt that Moss participated in a venture criminalized by Section 1591(a) (2). And that 379 Federal Appendix at 652. The purpose of the excerpts that I am reading from suggests to the Court that evidence of these defendants being stopped by police officers on non-sex trafficking matters could not be proved -- could not be relied upon to prove a criminal venture under Section 1591.

(Docket Entry No. 2636, at 2178-80) (emphasis added).

The Court also noted that this proof was Rule 404(b) evidence and the Government was seeking to use its "venture" theory to introduce Rule 404(b) evidence of other crimes. Aside from the authorities cited above, the Court would exclude such proof as unfairly prejudicial as an effort to prove sex trafficking charges by evidence of arrests wholly unrelated and uncharged crimes.

The Court also noted that for the Government's theory, the RICO Act[5] would encompass any crime unrelated and different criminal activity that was on behalf of the enterprise. Although the Government noted that enterprise and ventures were similarly defined, the Court stated that: "venture is an element of the offense" and "venture for sex trafficking requires proof the Defendants engaged in sex trafficking and proof of a traffic offense is not qualifying proof." In a word, "to prove two or more individuals are associated in a venture for a violation of this statute, the conduct pursuant to that venture under these cases has to be to promote the underlying offense. That is, to promote sex

---

[5] For these reasons, the RICO authorities cited by the Government in its reply (Docket Entry No. 3154 at 9) are legally inapposite.

trafficking." Id. at 2183-84.

As a matter of statutory construction, the Court must examine the parts of a statute as a whole and cannot isolate any particular provision and then use that provision "as a vehicle to ensnare conduct that the statute never contemplated." United States v. Thomas, 74 F.3d 701 (6th Cir. 1996) ("criminal statutes are to be strictly construed and that "no offense may be enacted except by the words Congress used in their usual and ordinary way"). The Fifth Circuit ruled in Longoria for Section 1591(a)(2) that "[m]ere negative acquiescence" is insufficient, Longoria, 569 F.2d at 425, "'[u]nless there is some sort of active proceeding on his part; he **must incite, or procure, or encourage the criminal act, or assist or enable it to be done, or engage or counsel, or command the principals to do it.**'" United States v. Aarons, 718 F.2d 188, 191 (6th Cir. 1983) (quoting Morei v. United States, 127 F.2d 827, 830-31 (6th Cir.1942)) (emphasis added). Thus, the Court again concludes that mere membership in the gang or association of two or more Defendants was insufficient to prove a venture under Section 1591(a)(2) and to be participant in the venture, the Government had to prove that the Defendant committed an "overt act" to advance the sex trafficking activities charged in the Second Superseding Indictment. The issue of "overt acts" is also discussed infra, at p. 33.

### C. Government's motion in limine on whether Title 18 U.S.C. § 1591 applies only to Sex Trafficking of persons under the age of 18 years (Docket Entry No. 3036)

In this motion, the Government challenges the Court's ruling at the prior trial that, 18 U.S.C. § 1591 applies only to the sex trafficking of children under the age of 18. The Court charged the jury that to find a defendant's guilt the United States was required to prove beyond a reasonable doubt that the person was under the age of 18 at the time of the alleged offense. (Docket Entry No. 2659

at 17738-17739, 17743-17744, 17756-17756-17757).  Earlier, the Court entered an Order that 18

U.S.C. § 1591 did not apply to the sex trafficking of adults, citing <u>United States v. Todd</u>, 627 F.3d

329, 331-332, 334-335 (9th Cir. 2010).  (Docket Entry No. 2897at 18907).  The Government

contends this ruling would exclude evidence regarding sex trafficking by means of force, threats of

force, fraud, and coercion of persons 18 years of age or older in the next trial of several Defendants.[6]

At the first trial, the United States argued that 18 U.S.C. § 1591 applies to the sex trafficking

of persons 18 years of age and older where such sex trafficking involves the use of force, the threats

of force, fraud, or coercion as provided in the statute.  Citing <u>Todd</u>, 920 F.3d at 401 and other Sixth

Circuit precedent, the Court cited the statute's language and title, cardinal rules of statutory

construction and a law review article to conclude otherwise.

> THE COURT: Well, in <u>United States v. Daniel</u>, 653 F.3d 399 (6th Cir. 2011) at Page
> 405, in referring to charges that were on appeal, the Court referred to 18 U.S.C.
> 1951(a) as, quote, "sex trafficking in children". The cases that I have researched all
> dealt with, on the-- in <u>United States v. Jungers</u>, 2011 Westlaw 6046495, District of
> South Dakota, (Docket Entry November 5, 2011, referring to Congress's enhancing
> its statutory protection of minors for sexually slavery by properly seeking out the
> greater punishment those who engaged in sex trafficking of children by force, fraud
> or coercion.

> In <u>United States v. Bonestroo</u>[7], 212 Westlaw 13704, District of South Dakota,
> January 4, 2012, the Court, in referring to this statute says that, "to satisfy the plain
> reading of the statute, the government need only show that Bonestroo knowingly
> enticed, recruited, or obtained a child, knowing that he or she would engage in a
> commercial sex act". In <u>United States v. Chappel</u>, 665 F.3d, 1012 (8th Cir. January
> 20, 2012), likewise, referred to this language of "reckless disregard of the fact that
> the (Docket Entry No. Defendant in that case -- " that the victim in that case had not
> attained the age of 18. In <u>United States v. Wilson</u>, 210 Westlaw 2991561, Southern

---

[6]The Court notes that it did not exclude evidence that Jane Doe Five was trafficked as an
adult.

[7] The Government reports that <u>Bonestroo</u> was overruled, but that does not undermine the
Court's reliance on the other decisions cited.

District of Florida July 27, 2012, refers to in the elements of the offense, I will just read the whole thing. Thus, the government must still prove beyond a reasonable doubt all the elements of 15 U.S.C. Section 1591(a) is the charges the defendant was causing a minor to engage in a commercial sex act. In this respect, even under the challenge provisions of 1591, the government must prove beyond a reasonable doubt all of the following elements: The defendant's actions were in or affecting interstate commerce or foreign commerce; Two, the defendant knowingly recruited, enticed, harbored, transported, provided, obtained or maintained a person and caused that person to engage in a commercial sex act; Three, that the person, in fact, was under the age of 18 at the time; and Four, that the defendant knew that the person had not reached the age of majority, or that the defendant recklessly disregarded the person's age and had a reasonable opportunity to observe the person. Thus, should the United States choose to establish a violation of section 1591(a) by showing recklessness, in addition to proving the first three elements of 1591(a), it must prove beyond a reasonable doubt both that the defendant recklessly disregarded the person's age and that the defendant had a reasonable opportunity to observe the persons. Citing 1591(a) and (c) and one of the decisions in that district. In <u>United States v. Todd</u>, 627 F.3d 329 (9th Cir. 2009), the Court observed about 1591: Title 18 Section 1591 is titled, quote: "Sex trafficking of children or by force, fraud or coercion. Although statutory titles are not a part of the legislative history, they may be instructive in putting this statute in context. By using this title, Congress intended to criminalize two forms of sexual trafficking it considered "severe forms of sexual trafficking in persons. Sex trafficking where the victim is under 18 years of age, and sex trafficking where the person is induced by force, fraud or coercion. Section VIII bears this out. Prosecution may be brought --Then it goes on to: One. Force, fraud or coercion will be used to cause the person to engage in a commercial sex act; or, Two, the victim has not attained the age of 18 and will be caused to engage in a sex act."

There is even a statute -- a law review article on this in the Cornell Journal of Law and Public Policy, 15 Cornell Journal of Law and Public Policy 495 at 523, talking about the Senate's -- that this provision of the Act, the TBPRA of 2008 incorporates the Senate's reckless disregard standard with respect to knowledge of the trafficking victim's age for other interested parties. If you look at the statute in terms of what's punished, then it seems to me that it's tied to under the age of 15. If you look to the title of the statute that's in the code , it's Sex Trafficking of Children or by Force, Fraud or Coercion. There are numerous references to this as being a sex trafficking of children statute.

*   *   *

THE COURT: . . . the Cornell Law article at 523 talks about how the 2008 amendments failed to reconcile two bills that had been introduced concerning protection of all victims of human trafficking. So like most statutes that are

compromised, they sometimes can create ambiguities.

(Docket Entry No. 2651, at 3005-08).

> THE COURT: Counsel, I have concluded . . . that 1591 applies only to children, people under the age of 18. The compilers of the statute gave this statute the title of Sex Trafficking of Children. The only age provisions in the statute are under the age of 18. The punishments provided in the statutes are based upon being under the age of 18. The Sixth Circuit has referred to this statute as a sex trafficking of children statute. All the other cases that I have read were in the context of sex trafficking under the age of 18. The government's purported distinction that coercion part of 1391(a) applies to those 18 or older would be only permissible by engrafting the words "18 years or older" on the statute. That argument is contrary to the canon of statutory construction of criminal statutes, that such statutes must be narrowly constricted. If Congress intended to apply that to over 18, they would have done so.
>
> In addition, the government's argument would also have the effect of excluding any evidence about Jane Doe 2 being forced to stay in the automobile, because under the Government's theory, the coercion perversion of the statute applies to victims over 18. If that's true, then that evidence would have to be excluded and could only prosecute a child under this statute when the child was recruited or enticed, and it would eliminate prosecutions for children who were trafficked by means of force. I think the references to use of coercion and force and recruitment just reflects the different ways in which children are sex trafficked. Some children are forced to do it; some children are enticed to do it. So for all those collective reasons, I have concluded that Section 1591 only applies as the title to the statute refers, that is, sex trafficking of children. As a final point of checking the Court's conclusion on this, I went back to the sheets that the government prepares to explain the charges that were filed with the Court. All those sheets refer to sex trafficking of children on Count Two under the age of 14 or under the age of 18. There is no reference in the summary to anyone over the age of 18. The Court believes that it would be a grievous error to include a group, that is the over-18 group, on a statute that is clearly labeled sex trafficking of children.

(Docket Entry No. 2653, at 3069-70).

The Court cannot discern any error in its prior ruling on this issue nor from its review of the decisions cited by the Government. (Docket Entry No. 3134 at 6-10).

### D. Government's motion in limine on whether sex is a "thing of value" for a conviction under 18 U.S.C. § 1591 (Docket Entry No. 3037)

The Government's next motion reflects its theory at trial that sex with Jane Doe Two was a "thing of value" that the Defendant gave to gang members. The Government does not cite a statute or court decision that sex alone is a "thing of value" under Section 1591 nor did any witness testify that they considered sex with Jane Doe Two to be a "thing of value". The Government argued that the statute refers to giving, and that to the extent a victim was given for sex, the sex would be considered a thing of value. (Docket Entry No. 2651 at 17251-17263).

The phrase 'commercial sex act' is set forth in Section 1591 and has been interpreted by the Courts to mean any sex act, on account of which anything of value is given to or received by any transactions that sex is economic in nature or pecuniary gain. At trial, the Court cited United States v. Paris, 2007 Westlaw 3124724 at *8 (D. Conn. Oct. 24, 2007) and other decisions that commercial sex acts under Section 1591 are economic in nature. As the Court observed at the first trial:

> From the Court's research on 18 U.S.C. § 1951 and its legislative history, this statute was enacted to deal with sex trafficking of children that is the buying and selling of children for sexual purposes, exploitation. There is a separate statute relating to having sex with a minor. The decisions cited by the United States at trial involved other legal and factual contexts. And the law of statutory construction for criminal statutes is against a liberal construction of criminal statutes. And you look at the purpose for which a criminal statute was enacted. The Court cited United States v. Bonestroo, 2012 Westlaw 13704 (D S. D. Jan. 24, 2010); United States v. Shamshut-Din, 211 Westlaw 5118840, N. D. Il. 2011). And the reason I raised that is, if the purpose of the statute is to prohibit the sale, buying children and selling children for prostitution, then I'm not -- I have serious doubts about all of this testimony about her individual acts, sexual acts, involving gang members that did not involve the selling of sex.

(Docket Entry No. 2629, at 1143-44).

> THE COURT: Well, the problem with that, it struck me that if that were true, then the Johns would be subject to liability under the act.

> \* \* \*

> MR. VINCENT: But the United States submits that because of that language "giving

27

to" or "received by" --

THE COURT: The only person who could receive it would be in the status of a John.

(Docket Entry No. 2647, at 2934-36).

> THE COURT: Status, when you say status, you are asking the jury to interpret what membership means. We have no testimony from a member of the gang. We have no expert testimony as to motivations for joining gangs and this is why you join gangs. And number three, we have evidence of them engaging in other activity other than these activities, and it would be piling inference on inference, and without factual support to argue status. Now, I don't know what the significance of status is to the government, but to me, what is done to achieve status within the gang requires some proof from somewhere in the gang how that was used or somebody who is an expert who can tell you what it is.

*   *   *

> THE COURT: So I'm going to bar argument about status. But you can argue as economic value that they gave this young -- gave a victim to others.

(Docket Entry No. 2651, at 3017-18).

This motion challenges the Court's various statements during the trial, but the Court's actual jury instruction was that what constitutes a "thing of value" was a factual issue for jury to decide: "Money need not be involved in order for you to find that value was given or received on account of the sex act. Whether anything is of value depends on the facts of each case. You must decide in this case if anything of value was exchanged for any sexual act. However, you must find beyond a reasonable doubt that something of value was involved." (Docket Entry No. 2659 at 17723-17724); see also Docket Entry No. 2958-1 at 19370.

Again, the Court observes the Government's legal construction is unsupported by case law, and the Court does not discern any error in allowing the jury to decide the Government's factual theory on what constitutes a "thing of value" under Section 1591.

**E. Government's motion in limine on whether Teachers and Law Enforcement Officers are experts when testifying to their perception of a person's age**

In this motion, the Court is asked to reconsider whether a teacher's testimony at the prior trial regarding her perception of a child's age was expert testimony. (Docket Entry No. 15766-15793). The Government also challenges the Court excluding similar proffered evidence of law enforcement officers' opinions regarding the age of any person. (Docket Entry No. 2631 at 15794-15795).

Federal Rule of Evidence 701 authorizes the admission of lay opinion testimony, but such testimony "is limited" and can "not be based on scientific, technical or **other specialized knowledge.**" (emphasis added). Where a law enforcement officer provides fact testimony and opinion testimony, a special jury instruction must be given on expert testimony. United States v. Lopez-Medina, 461 F.3d 724, 748-50 (6th Cir. 2006). Where the age of a witness is a critical issue in a criminal case, expert testimony may be necessary, United States v. Katz, 178 F.3d 368, 373 (5th Cir. 1999), but is not always required. United States v. O'Malley, 854 F.2d 1085, 1086-88, n.3 (8th Cir. 1988); United States v. Riccardi, 298 F.Supp.2d 1212, 1219 (D. Kan. 2003).

Prior to trial, several defendants earlier moved for disclosures of experts' reports, but the Government represented that no such reports were to be used and the Court denied the defense motions. (Docket Entry Nos. 1088, 1213 and 1613). At trial, the Court permitted several lay witnesses to give their opinions about Jane Doe Two's age. The Government then sought to elect from a teacher, opinion testimony on Jane Doe Two's age, citing the teacher's years of service and the number of students whom the teacher observed over her more than 30 years of service. The Court excluded such testimony for reasons set forth in the following colloquy with Government's counsel:

MS. COOK: **Your Honor, after 33 years of teaching, I think she would be in a position to know if she has a 18 year old in her class or if she has someone who is inappropriately placed there, based on their age.**

THE COURT: Yes, but that's the point I'm getting at. If that is the basis for what you are asking, then this is expert opinion testimony governed by Rule 16 for which there would need to be a report. I granted a Rule 16(a) motion filed by the defendants. And the response to that motion by the government was, the government has fully complied with all of these. And I don't remember seeing any reports of this witness.

MS. COOK: Your Honor, and that's correct. We did not list her as an expert witness.

THE COURT: **But what you're -- so this isn't really lay knowledge. You are laying a predicate for all this specialized knowledge that she has, based on her years of teaching. And I'm not sure that, just because you teach for that many years, that that gives you the requisite experience to state this opinion. That seems -- first of all, I think it's a violation of Rule 16, and the advisory committee note says that's why they have Rule 702. They amended it: "Also ensures that a party would not abate the expert witness disclosure requirement set forth in the Federal Rules of Civil Procedure 26 and Federal Rules of Criminal Procedure 16 by simply calling an expert in the guise of a layperson.**

MS. COOK: Your Honor, I will give this another shot. To the extent that she can testify about whether she suspects someone is inappropriately placed, upon that suspicion, she would refer that person for a series of tests and batteries to determine exactly where that person should be placed. We're not calling those experts.

THE COURT: The thing is, is that there is no way to test that. Part about admissibility of expert testimony is the ability to test it. That's what Daubert was all about. Otherwise, somebody can get up on the stand and say they have all this experience, and there is no way to validate what they are saying.

MS. COOK: I agree. But it's not as if she is saying conclusively whether this person is appropriately placed.

THE COURT: But that makes it even less proper, her testimony.

MS. COOK: Does she have a basis for suspicion after 30 years of teaching?

THE COURT: It has no basis. If it is a suspicion, I don't know what probative value that carries, because it couldn't possibly be tested.

MS. COOK: Your Honor, I submit that, after 30 years of teaching, as a teacher of

middle school children –

THE COURT: That may well be. But I'm saying, that's the point. You are saying that's expert testimony, and you would have to comply with Rule 16, and there has been no compliance.

MS. COOK: Can she look at -- for example, Your Honor, can she look at the yearbook picture of Jane Doe 2 in 2006, and can she look at that picture and state, based on her experience teaching Jane Doe 2, as well as just by looking at that picture, if she is inappropriately placed there.

THE COURT: But that's an expert opinion.

MS. COOK: Okay.

THE COURT: That's not lay opinion. The only way she acquires that is by the 30 years of education to which you elicited on the direct examination.

(Docket Entry No. 2630, at 1554-56).

The Court also observed that: "[T]o call a witness to the stand, and once they identify their vocation and manner in which they came to know the Jane Doe Two, once you have asked them their occupation, that's going to carry with it the whole set of implied qualifications and experiences on age that, from the Court's perspective, necessarily implicates Rule 702, which is a separate requirement before you can present expert testimony. And the Court believes that just their status as teachers puts them in that category." (Docket Entry No. 2631, Judge Haynes at 15792-15793). The manner in which the Government sought to elicit testimony from teachers and intended to elicit from police officers led the Court to conclude that these witnesses' testimony was or would be based upon their specialized knowledge from numerous years in their line of work. Opinion testimony based upon specialized knowledge is subject to Daubert standards. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141, 147-49 (1999). If the testimony is presented on the same bases as at the first trial, the Court will follow the same ruling.

## F. Government's motion in limine on admission of expert testimony in the United States rebuttal proof

At the first trial and after the Court's ruling on the teachers, the Government next sought to present expert testimony from a radiologist and forensic dentist as rebuttal proof. (Docket Entry No. 2647 at 17041, 17044-17048, 17059-17062). During trial, late on or about April 8, 2012, the Government served defense counsel with statements of a radiologist and forensic dentist who opined about Jane Doe's age. These reports cited Jane Doe's birth date as September 10, 1994 that is based upon immigration records. The DNA tests revealed the dates of birth on immigration documents to be false. Defendants also cited the lack of the bases for these experts' opinions and their qualifications.

The Court granted the requests to exclude these expert statements based upon the precedent in this district and the fundamental unfairness to the defense for the Government to secure experts during the trial to perform testing that the Defendants could not contest. See United States v. Davis, 514 F.3d 596, 604 (6th Cir. 2008) (upholding district court's denial of exclusion of expert report based upon the Government's substantial compliance with Rule 16(a)(1)(G)). No such substantial compliance is present here. The Court noted that if the Defendants had offered expert testimony on Jane Doe Two's age, then the Court would admit the testimony of the Government's experts in rebuttal. Id. at 17061. The Court also cited historical practice of this Court to bar testimony of experts who performed experiments and analysis during trial. The Local Rule of this district requires a party to provide the expert's report prior to trial to afford the opposing party a fair opportunity to respond to the expert proof. (Docket Entry No. 2647 at 1760).

The Government also contends that rebuttal witnesses are recognized exceptions to all

witness disclosure requirements, citing United States v. DiCarlantonio, 870 F.2d 1058, 1063 (6th Cir. 1989) and United States v. Frazier, 387 F.3d 1244, 1269 (11th Cir.2004); United States v. Barrett, 766 F.2d 609, 617 (1st Cir.1985); United States v. Angelini, 607 F.2d 1305, 1308-09 (9th Cir.1979).

First, rebuttal evidence is limited to "new" defense evidence or theories. United States v. Bland, 2007 WL 2781114, at *3 (6th Cir. Sept. 25, 2007) (citing Toth v. Grand Trunk R.R. Co., 306 F.3d 335, 345 (6th Cir. 1981). Defendants did not offer any "new evidence" expert or otherwise, nor assert a "new theory" of defense. The Defendants relied upon the documents in the Government's discovery disclosures.

Moreover, the Court's ruling also cited the radiologist's and dentist's reports reliance upon Jane Doe Two's September 19, 1994 birth date that is based upon false immigration documents and Jane Doe Two's false birth certificate. A year prior to trial, the Government's lead counsel knew Jane Doe Two's birth certificate was false. In addition, the defense counsel cited their need to consult experts to cross examine the Government experts about the effects of the circumstances of Jane Doe Two's life in Somalia prior to arrival in this country. Without expert assistance, defense counsel could not provide effective assistance of counsel in cross examining an expert. The logistics of securing an expert for indigent Defendants in the middle of trial were preclusive barriers.

If the same factual scenario arises at the second trial, the Court is unaware of any legal basis for a different ruling. The Court did note that expert testimony would be necessary for the age issue for a second trial that should render this issue moot.

### G. Government's motion in limine on whether a violation of Title 18 U.S.C. § 1591(a)(2) requires proof of an overt act

In this motion, the Government challenges the Court's ruling that 18 U.S.C. § 1591(a)(2) requires proof of an overt act. The Court instructed the jury, in pertinent part, that "[w]here a conspiracy involves a criminal venture, as in Section 1591(a)(2), a member of the conspiracy must agree to commit an overt act for the purpose of advancing or helping the conspiracy." (Docket Entry No. 2659 at 17730). The Court further charged the jury:

> "Now, in the conspiracy charging a violation of Section 1591(a)(2), the government must prove that a member of the conspiracy agreed to commit an overt act for the purpose of advancing or helping the conspiracy. The Second Superseding Indictment lists overt acts. The government does not have to prove that all these acts were committed, or that any of these acts were themselves illegal. But the Government must prove that at least one of these acts was committed by a member of the conspiracy, and that it was committed for the purpose of advancing or helping the conspiracy. This is essential."

(Docket Entry No. 2659 at 17733).

During the trial and the conference on jury instructions, the Court provided its rationale for this instruction.

> THE COURT: I want you to look at <u>United States v. Moss</u>, 379 Fed. App. 651 (9th Cir. 2010), that discusses the sufficiency of the evidence that was filed on May 18, 2010, that discusses sufficiency of the evidence for a sex trafficking venture.
>
> \* \* \*
>
> . . . [T]here are also other cases on the issue of what it takes to prove a criminal venture. It's <u>United States v. Longoria</u>, 569 F.2d 422 at Page 425 (5th Cir. 1978). But <u>Longoria</u>, it's a Fifth Circuit case, but I'm giving it to you because it has been cited approvingly by the Sixth Circuit in <u>United States v. Aarons</u>, 718 F.2d 188 at 191 (6th Cir. 1983). And cited more recently in <u>United States v. Coppin</u>, 1 Fed. App. 283 at 294. In essence, <u>Longoria</u> states that, quoting one of its prior decision: **"To be upheld, a conviction must be based upon evidence that the defendant was associated with a criminal venture, participated in it as something he wished to bring about and sought to make his actions to make it succeed. To prove the association, there must be evidence to establish the defendant shared in the criminal intent of the principal. To prove participation, there must be evidence to establish that the defendant engaged in some affirmative act, that is, there**

**must be evidence the defendant committed an overt act designed to aid in the success of the venture. Proof of mere negative acquiescence will not suffice."** And it has been cited on that point by the Sixth Circuit in the cases that I have cited to you. In particular, in the <u>Coppin</u> case, the Sixth Circuit said: "At most, the government has shown that the defendant helped drive Garcia to Cincinnati, but there is no evidence that the defendant knew that Garcia was traveling to Cincinnati to participate in a drug deal. In the absence of evidence showing that the defendant knew of the criminal venture, the government cannot prove that the defendant intended to make the criminal venture succeed. In this case, evidence is insufficient to support a conviction for aiding and abetting, and no rational trier of fact would have concluded that defendant knew of the criminal venture and acted in such manner as to make the criminal venture succeed. And then cited <u>Longoria</u> in the reference to: Mere association is not, without more sufficient evidence for aiding and abetting, a criminal venture."

(Docket Entry No. 2636, at 2062, 2178-79). The Government has not identified nor does the Court discern any error in its ruling.

### H. Government's motion in limine on whether the testimony of Khaulid Noor, Farhan Daud and Dahir Daud is admissible (Docket Entry No. 3038)

This motion focuses on the Court's exclusion of these witnesses' testimony for lack of any tie to the Defendants and the prejudice to the Defendants, if witnesses testified. In summary, the Government's position was expressed as follows:

> MR. VINCENT: Your Honor, as the Court may recall, Government's Exhibit 121 and 122 have been introduced into evidence during the testimony of Jane Doe 2. During her testimony she talked about going to the Parkview Apartments, and was able to point out two specific apartments and the persons associated with those apartments. One of those persons at Government's Exhibit 121 is Khalid Noor. That's a photo of Khalid Noor. Government's Exhibit 122 is a photo of Dahir Daud. During the course of Jane Doe 2's testimony, she discussed that there were two brothers at one of the apartments. That's the one where Dahir Daud was at. And that those were people that she could remember the location of the apartments where she had been and that they had engaged in sex with her. Dahir Daud is probably not going to be called to actually testify, but Farhan Daud and Khalid Noor would be. The United States anticipates that Farhan Daud would testify that he had been contacted by someone he knew that lived in the apartment complex, that they arrived in a green van, that this was approximately April or

35

May of 2007, and that he had been called and said that they had a girl for sale, that this was the only time he ever paid for sex with a girl, and that he paid $20 for oral sex, and that the sex actually occurred in the van, according to Farhan Daud.

Khalid Noor, the government anticipates, will testify that he was met by Jamil who lived in the Parkview Apartments, that he had gone to school with this individual, the same for Farhan on that point. And that he had been met down at the elevator, that the guy had a girl for sale, told him that for $10 he could get oral sex.

THE COURT: The thing that bothers me, the agent's statement says that it was a blue van.

MR. VINCENT: I'm sorry, Your Honor?

THE COURT: The agent's statement of what Farhan Daud said, he went to a van that was a blue van.

MR. VINCENT: I believe he says in his grand jury testimony that it was a green or dark colored van, he's not exactly sure of the color in his grand jury testimony. So he says green or dark colored. I can show the Court the grand jury testimony.

THE COURT: I'm reading it.

MR. VINCENT: Did I get the wrong, it's blue? That was actually the grand jury testimony that he said green or dark. But regardless, that he was met, he went down in the van, engaged in sex. Again, these are people that Jane Doe 2 connected –

THE COURT: But this grand jury testimony is, he is asking questions contrary to what he actually said. There wasn't any ambiguity in his statement. I think I kind of guessed at something like that. But if he was asked about his statement, it's actually blue.

MR. VINCENT: Okay. Fine. Regardless of the color, Your Honor, it matches, because of Jane Doe 2's picking out that apartment and the two brothers at the apartment, he would say that -- or I anticipate he will say that this is the only time he –

THE COURT: But I don't see anything in this statement or in the testimony that it was at the Cedar apartments, if that's what you are referring to.

MR. VINCENT: At the Parkview Apartments, Your Honor.

THE COURT: Or Parkview. I don't see anything related to Cedar or Parkview.

MR. VINCENT: That's what the United States anticipates the testimony will be. He was there, he was living at home when he got the call. I can pass the entire grand jury to the Court which for Farhan Daud was, Exhibit 123, and Farhan Daud is 126. And I can get a copy and pass it to the Court.

THE COURT: For the purpose of this hearing, just so the record will be clear what the Court considered, the Court is going to mark Noor's grand jury testimony Government Exhibit Number 1 to this hearing, and Farhan Daud's testimony Exhibit 2 to this hearing.

I also understand we have one juror missing. Anything else?

MR. VINCENT: Your Honor, the United States submits that their testimony is relevant and relates to the events at the Parkview Apartments, which is also (inaudible). The individuals, the United States would anticipate, would both say that they didn't really pay any much attention to the girl, that they thought she was 18 years old, and that these person -- this person they know as Jamel, or Jamal, had called them, or had met Fuad Nur, they actually met him at the elevator, and that was the only time that they had engaged in this conduct.

THE COURT: **Do we have any -- who is Jamal?**

MR. VINCENT: **They knew that he lived in the building.**

THE COURT: **Yes, but is Jamal going to be identified as any of these defendants?**

MR. VINCENT: **No, sir.**

THE COURT: **Well, how would that be relevant?**

MR. VINCENT: **Well, Your Honor, BG has never been identified by who he actually is. The situation matches what Jane Doe 2 describes, that there are three --**

THE COURT: **Yes, but it's got to relate to one of these defendants, doesn't it? If there were others out there who were selling her, it wouldn't be probative of these defendants, would it?**

MR. VINCENT: **Well, both Mr. Daud and Mr. Noor would say that there were either three males total or four males total with the girl.**

THE COURT: **Yes, but if there is no identification with any of these defendants,**

how is it relevant?

MR. VINCENT: **Well, Jane Doe 2 testified that Department of Number 30 had taken her over there, that he was one of the individuals when they would go to the Parkview Apartments that would take her there. There was BG, DK, and I'm drawing a blank on the third -- Kamal, who is Defendant Number 11, and that they would take her to these locations. That she recalled these particular individuals because she remembered the apartments, because they would take the agents up to the apartment. They would identify those pictures that she identified of them -- well, Khalid Noor would identify his picture, and Farhan Daud would identify his brother's picture, it's is the one that she picked out. She talks about the two brothers, that that apartment had two brothers. It's a circumstantial –**

THE COURT: **Yes, but I'm having difficulty, unless the brothers identify one of these defendants, how that could be relevant.**

MR. VINCENT: **Because it matches her description of the events. She also testified that BG lived in the Parkview Apartments. They say that this person that they know as Jamal lived in the Parkview Apartments also.**

THE COURT: **But they are not going to identify Jamal as BG?**

MR. VINCENT: **We have never been able to identify who Jamal actually is. So we don't have a picture of BG that we know of.**

THE COURT: Or Jamal?

MR. VINCENT: Or Jamal. We have never been able to identify -- I can tell the Court they said that they went to school with him, and we looked for people with that same name that they know him as. We couldn't find it in the school records and classes that they also attended. So that's how we tried to cross reference the name that they knew him by. But we weren't able to narrow down a particular person.

When we went to the apartment where the individuals thought that this person lived, we didn't get any cooperation from the lady that lived in the apartment to find out any names of people actually -- that may have ever stayed over. So we don't -- as far as we know, we don't have a picture of BG that anybody has ever identified.

THE COURT: Anything else?

MR. VINCENT: No, sir. Just one second.

Not in Jane Doe 2's testimony, but Farhan Daud picked out the apartment that he believed Jamal lived at, and it also was the same apartment JD 2 has picked out for the person she knew as BG. But we never were able to identify a person actually in the apartment by any name that was a male.

THE COURT: Anything further from the government?

MR. VINCENT: No, sir.

(Docket Entry No. 2631, Transcript at 9-15) (emphasis added).

Defense counsel who raised this issue then responded:

THE COURT: Well, it's his motion. Anything further you want to say, Mr. Drake?

MR. DRAKE: Your Honor, I would just say that, as Your Honor can see, this is so tenuous as to not even be material. Then I will defer to counsel.

MR. GONZALEZ: Jerry Gonzalez for Number 15. The only thing I want to add, Your Honor, is because the government has indicted these defendants as part of a single conspiracy, they should be precluded from introducing evidence of what possibly could be a totally separate conspiracy that just happened to be in the same apartment complex. There has to be a nexus to indict a conspiracy.

MR. MILLER: Good morning, Your Honor. Lance Miller on behalf of Mohamed Amalle, Defendant Number 30. I would like to respond to Mr. Drake's motion, and I would like to join in it as well. Of course, the Court has already observed that the van that Mr. Farhon Daud has testified to in his grand jury testimony is uncertain. And I would point the Court to Page 12 of the transcript where the prosecutor prompts him four times to say it's a green van, and he says he's not sure, until finally he says that he thinks it -- I thought so -- after four leading questions. And then he takes a break and has a conversation. I would note for the Court that Mr. Vincent tends to link this testimony to my client Mr. Amalle, but in this grand jury testimony he never identifies my client at all. And he doesn't identify Mr. Kamal, who is indicted. Instead, he refers to and spells out on Page 14, Line 5 and 6, a Jimale, J-i-m-a-l-e, as he spells it. And every time that he mentioned Mr. Jamal, it's that person who is driving, and never my client. So I would dovetail that in with Mr. Drake's in that the relevance of this is minimal. And I think that also on under 403 grounds it might confuse the jury and, therefore, would be inadmissible under 403. Thank you.

Id. at 15-16.

The Court then concluded a final colloquy with Government counsel:

THE COURT: Does the government have any response to Mr. Gonzales' point -- and I think it's in the case law -- that if you indict one conspiracy you can't introduce evidence of another conspiracy, because it would enlarge the indictment and include matters not within the conspiracy.

MR. VINCENT: The United States submits that these events are this conspiracy. It's circumstantially -- JD 2 picks out Mr. Noor and Dahir Daud and says he had a brother. Farhan Daud will testify that he is -- we anticipate that he will testify that he is Dahir Daud's brother, that he did get a call from this person he knows as Jamal, that it was the only time he engaged in this conduct. Mr. Noor, I believe, will also say it's the only time he engaged in this conduct. That there were either three or four males with the girl, and that they -- you know, with Farhan Daud, that they told him that they needed gas money, so it was $20 for gas, but he understood what was really going on, and he got oral sex in exchange in the van. I believe Noor will say that he was told $10 for oral sex, and that they went up to his apartment, which coincides with Jane Doe 2's testimony.

So while Jamal is not the same name as BG, and the United States anticipates that the two witnesses will both say that they don't know that person by the name BG, that they don't know Jamal by the name BG. That the circumstances in her picking out those persons and then corroborating that only on one occasion have they engaged in this conduct, that it puts it into this conspiracy. It's not a separate conspiracy; it is this conspiracy.

THE COURT: But the -- anything else?

MR. VINCENT: No, sir. Just one moment, Your Honor. The United States would submit that the weight of that evidence is for the jury to determine that it's not -- it's for the fact-finding associated with it.

THE COURT: Well, I'm not into the weight, only admissibility.

MR. VINCENT: Well, the United States submits that it's admissible because she picked out these people. They admit that they engaged in this conduct with the girl, while they don't remember -- I anticipate that they would say they didn't really pay any attention to her so much. That we anticipate the testimony will be that this is the only time they engaged in this conduct.

THE COURT: **Well, I just want to make sure I've got this right. Number one, they don't identify any of the defendants.**

MR. VINCENT: **Correct.**

THE COURT: **Number two, they don't identify Jane Doe 2.**

MR. VINCENT: **Correct.**

THE COURT: **And the only tie to this case is that it's at the Cedar or Parkview Apartments.**

MR. VINCENT: **And that Jane Doe 2 picked out Mr. Noor, and picked out Dahir Daud, and said that at the apartment were Dahir Duad, it was the two brothers. Dahir and Farhan Duad are brothers.**

**So she actually led the investigators and testified that she was able to pick out these two, because she remembered those two apartments.**

Id. at 16-18 (emphasis added). As a defense counsel noted, during the grand jury proceeding, lead government counsel asked a witness four times if the van was green, but the witness repeatedly responded blue.

"Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401; United States v. Warman, 578 F.3d 320, 347 (6th Cir. 2009) Fed. R. Evid. 402 excludes "irrelevant" evidence. Moreover, under Rule 403 of the Federal Rules of Evidence, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

Here, the Government's proof with these witnesses refers to two individuals "BG" and "Jamal" who are not identified by anyone. "Jamal" is referred to as the person who made the arrangements for sex with Jane Doe Two. Although these three witnesses are stated to have had

commercial sex with Jane Doe Two, these witnesses could not identify Jane Doe Two, the location of acts is ill defined by reference to two locations, and one witness described the van as of a different color. Under these circumstances, the Court does not discern the probative relevance of these witnesses. These circumstances are suggestive of other bad acts that are not tied to these Defendants. In this setting, the Court considers this proof to be marginally relevant, but highly prejudicial and would exclude this proof again under Fed. R. Evid. 403.

Accordingly, for these reasons, the Court concludes that Government's motions in limine (Docket Entry Nos. 3034, 3035, 3036, 3037, 3038, 3039, 3040, and 3041) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the 12 day of June, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court